FILED
08 JUL 22 PM 1:06
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

Brooks R. Brown (SBN 250724)
*bbrown@goodwinprocter.com*
**GOODWIN PROCTER LLP**
10250 Constellation Blvd, 21st Floor
Los Angeles, CA 90067
Tel.: 310.788.5100
Fax: 310.286.0992

Thomas M. Hefferon (*pro hac vice to be filed*)
*thefferon@goodwinprocter.com*
**GOODWIN PROCTER LLP**
901 New York Avenue, NW
Washington, DC 20001
Telephone: (202) 346-4000
Facsimile: (202) 346-4444

Paul G. McNamara (SBN 106080)
*pmcnamara@omm.com*
**O'MELVENY & MYERS LLP**
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

Attorneys for Defendants: COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; and FULL SPECTRUM LENDING, a Division of Countrywide Home Loans, Inc., erroneously named as Full Spectrum Lending, Inc.

Goodwin Procter LLP
10250 Constellation Boulevard
Los Angeles, CA 90067

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SAN DIEGO DIVISION

| | |
|---|---|
| ROY V. HURSH,<br><br>Plaintiff,<br><br>v.<br><br>COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; FULL SPECTRUM LENDING, INC.; ANGELO MOZILO; DAVID SAMBOL; and DOES 1-100, inclusive,<br><br>Defendants. | Case No. '08 CV 1313 J NLS<br><br>**NOTICE OF REMOVAL** |

Goodwin Procter LLP
10250 Constellation Boulevard
Los Angeles, CA 90067

Defendants Countrywide Financial Corporation ("CFC"), Countrywide Home Loans, Inc. ("CHL"), and Full Spectrum Lending, a Division of Countrywide Home Loans, Inc., erroneously named as Full Spectrum Lending, Inc. ("FSL") (collectively, "Countrywide") hereby give notice of removal of the above-captioned action, Case No. 37-2008-00086826-CU-OR-CTL, to the United States District Court for the Southern District of California. Removal is based on 28 U.S.C. §§ 1332 and 1441, as amended in relevant part by the Class Action Fairness Act of 2005 ("CAFA"), and authorized by 28 U.S.C. § 1453.

As grounds for removal, Countrywide states the following:

1. On or about July 2, 2008, Plaintiff Roy V. Hursh, on behalf of himself, and purportedly on behalf of others similarly situated, filed a "Complaint for 1. Violation of Business and Professions Code Section 17500 (Untrue or Misleading Statements) 2. Violations of Business and Professions Code Section 17200 (Unfair Competition)" ("Complaint") with the Clerk of the Superior Court of California, County of San Diego (the "State Court Action"). The State Court Action was assigned Case No. 37-2008-00086826-CU-OR-CTL.

2. Plaintiff is a citizen of California, and has been at all relevant times. He alleges that he obtained a home mortgage loan from defendants, and he currently resides, and has resided at all relevant times, in San Diego County, California. Complaint ¶ 4.

3. Plaintiff obtained a mortgage loan from Countrywide in 2006, which he describes as a "Pay Option ARM." Complaint ¶ 56. Plaintiff alleges that his loan had a low "introductory" or "teaser" rate; that, after expiration of the introductory period, Plaintiff had four options for making further payments and selected a "minimum" payment option; that his payments remained the same for a year and then began to increase substantially; and that, because of the features of his loan, the monthly payment will further increase and he will experience "significant payment shock" in the future. Complaint ¶ 57, 60, 61, 62.

4. Plaintiff brings claims on his own behalf and on behalf of a putative class which he defines as follows: "any consumer who obtain [sic] any type of mortgage funding from defendants from 2000 to present." Complaint ¶ 20. Countrywide made and makes loans nationwide. Id. ¶ 34.

5. Plaintiff alleges that Countrywide violated California Business and Professions Code Section 17500 by making or disseminating untrue or misleading statements to induce him and others to enter into mortgage loans. Complaint ¶ 132-33 (First Cause of Action). Plaintiff also alleges that Countrywide engaged in acts or practices that constituted unfair competition in violation of California Business and Professions Code 17200. Complaint ¶ 135 (Second Cause of Action).

6. Plaintiff seeks various forms of relief, including (a) certification of the action as a class action; (b) an award of compensatory damages; (c) an award of punitive damages; (d) restitution; and (e) attorney's fees, pursuant to California Code of Civil Procedure 1021.5. Complaint at 32 ("Prayer for Relief for All Causes of Action").

7. Plaintiff names as defendants CFC, CHL, and FSL, as well as two former Countrywide officers, Angelo Mozilo and David Sambol. Complaint ¶¶ 5-10. Plaintiff also names as defendants "Does 1-100," who Plaintiff alleges are persons or entities responsible in some manner for the activities alleged in the Complaint but whose names and capacities Plaintiff does not know. Complaint ¶ 11.

8. CFC is a Delaware corporation with its principal place of business in California. This was true at the time suit was filed and is true now. CFC is thus a citizen of Delaware and California. 28 U.S.C. § 1332(c)(1)

9. CHL is a New York corporation with its principal place of business in California. This was true at the time suit was filed and is true now. CHL is thus a citizen of New York and California. 28 U.S.C. § 1332(c)(1).

10. FSL is an unincorporated division of CHL. This was true at the time suit was filed and is true now. FSL therefore has no citizenship apart from the citizenship of CHL. Brietman v. May Co. of California, 37 F.3d 562, 564 (9th Cir. 1994).

## STATUTORY REQUIREMENTS – CLASS ACTION FAIRNESS ACT

11. This Court has Jurisdiction. Pursuant to 28 U.S.C. § 1332, as amended by CAFA, a putative "class action" commenced after the effective date of CAFA may be removed to the United States District Court embracing the state court where the action was filed if (a) any member of the putative class is a citizen of a state different from any defendant, and (b) the amount in controversy

Goodwin Procter LLP
10250 Constellation Boulevard
Los Angeles, CA 90067

exceeds the sum or value of $5,000,000, exclusive of interest and costs. Complete diversity among parties is not required. 28 U.S.C. § 1332(d)(2)(A).

12. CAFA is applicable to the State Court Action because it was commenced after the effective date of the Act. Notes to 28 U.S.C. §§ 1332 & 1453 ("The amendments made by this Act shall apply to any civil action commenced on or after the date of enactment of this Act," — *i.e.*, February 18, 2005) (citing Pub. L. 109-2, § 9, 119 Stat. 14).

13. The State Court Action is a "class action" within the meaning of CAFA because it is a "civil action filed under" California Code of Civil Procedure 382 (Complaint ¶¶ 2, 20) – *i.e.*, California's analog to Fed. R. Civ. P. 23 and a "rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. §§ 1332(d)(1)(B), 1453(a). Countrywide denies, however, that this case could be certified as a class action, and expressly reserves its right to oppose any motion for class certification filed in this action.

14. Citizenship of Parties. The requisite diversity of citizenship exists under 28 U.S.C. §§ 1332(d)(2) and (d)(7). Plaintiffs allege a putative class action on behalf of all borrowers who obtained a loan from any of the defendants, and allege that Countrywide makes loans nationwide. Complaint ¶¶ 20, 34, 51. The putative class therefore embraces citizens of all fifty states. In contrast, the removing defendants' citizenship encompasses only the states of New York, Delaware and California. Thus, at least one defendant is a citizen of a state different from at least one class member.

15. Amount in Controversy. There is more than $5,000,000 in controversy in this action. Under 28 U.S.C. § 1332(d), as added by CAFA, the amount in controversy in a putative class action is determined by aggregating the amount at issue of the claims of all members of the putative class. 28 U.S.C. § 1332(d)(6). While Countrywide denies that Plaintiff or any putative class member is entitled to recover any sum, and specifically denies that Plaintiff or any putative class member is entitled to the relief in the various forms and amounts sought, the Complaint's allegation of a putative class and the relief sought place an aggregate amount in controversy of more than $5,000,000, exclusive of interest and costs.

Goodwin Procter LLP
10250 Constellation Boulevard
Los Angeles, CA 90067

Goodwin Procter LLP
10250 Constellation Boulevard
Los Angeles, CA 90067

16. The aggregate amount in controversy is met for at least two separate and distinct reasons.

17. First, Plaintiff has requested "an award of compensatory damages in an amount not less than $5,000,000" and "punitive damages in an amount not less than $5,000,000." Complaint at 32 (prayer for relief). As Plaintiff has collectively requested at least $10,000,000 in relief for the putative class, these demands alone place in controversy more than $5,000,000, exclusive of interest and costs.

18. Moreover, each demand for damages, standing alone, involves an amount in controversy that exceeds $5,000,000, exclusive of interest and costs, because, in addition to the damages sought, Plaintiff seeks attorney's fees available by California Code of Civil Procedure 1021.5. Complaint at 32 (prayer for relief). See Cal. Code Civ. P. 1021.5 (authorizing recovery of attorney's fees for a prevailing party in certain instances). Attorney's fees allowed by statute, rule, or other source of law, when demanded, are included in determining the amount in controversy. Kruske v. U.S. Bank Corp., 432 F.3d 976, 980 (9th Cir. 2005).

19. Second, Plaintiff seeks "restitution of all revenues, earning (sic), compensation and benefits obtained as a result of [defendants'] wrongful conduct." Complaint at 32 (prayer for relief). In so doing, Plaintiff is seeking restitution and disgorgement as part of a class action. See Kraus v. Trinity Management Services, Inc., 23 Cal.4th 116 (2000)(collecting cases). This demand for relief independently meets the jurisdictional minimum for a number of reasons:

(a) Plaintiff alleges that as a result of the wrongful conduct, Countrywide earned $1.2 billion from negative amortization on Option ARM loans like his. Complaint ¶ 70. This places more than $5,000,000 at issue related to his demand for "restitution of all . . . earning (sic)."

(b) Plaintiff alleges a class that includes persons who obtained all loans made by Countrywide from 2000 to present, and alleges that the class includes at least 20,000 borrowers. Complaint ¶¶ 20-21. While Plaintiff seeks restitution of amounts "obtained as a result of [defendants'] wrongful conduct," he does not limit the scope of loans involved in the case and therefore asserts that wrongful conduct is involved, in at least some fashion, with all loans. While Countrywide vigorously denies that it has engaged in any unlawful conduct with respect to any

Goodwin Procter LLP
10250 Constellation Boulevard
Los Angeles, CA 90067

loans, Plaintiff's request for restitution of "all revenues, earning, compensation and benefits" implicates very significant monetary sums; in just 2007 alone, Countrywide's reported revenues from its mortgage lending operations was $2.74 billion. See Countrywide Financial Corporation, Form 10-K at pg. 66 (filed Feb. 29, 2008), available at www.sec.gov.edgar.

(c) Plaintiff alleges that Countrywide sold "thousands" of Pay Option ARMs and that its gross profit margin was "approximately 4%" of the original principal balance on these loans. Complaint ¶¶ 68-69. In 2005, Countrywide originated Pay Option ARM loans which had an original principal balance of $95 billion, and originated $64 billion of such loans in 2006. See Countrywide Financial Corporation, Form 8-K, Exhibit 99.1 at pg. 1 (filed Jan. 12, 2007), available at www.sec.gov.edgar. Without crediting Plaintiff's allegation that Countrywide's gross profit margin was 4%, that allegation, in conjunction with the demand for "restitution of all . . . compensation . . . for [defendants'] wrongful conduct," places more the $5,000,000 at issue.

(d) Plaintiff's allegation that the class consists of at least 20,000, means that for more than $5,000,000 to be in controversy, the restitution and disgorgement remedy would only have to *average* $250 per borrower. Plaintiff's allegations that Countrywide sold "thousands" of Pay Option ARMs and that each month he has paid $1449.50 to Countrywide for two years (Complaint ¶¶ 60-61, 63, 68), coupled with the assertion that a class should be certified – one requirement of which is that Hursh is typical of injured class members – places more than $5,000,000 in controversy due to his demand for restitution of "all revenues . . .and benefit obtained as a result of [defendants'] wrongful conduct."

(e) Plaintiff asserts that compensatory damages alone amounts to "not less than 5,000,000." Complaint at 32. In these circumstances, Plaintiff's request for restitution will implicate more than his request for compensatory damages. Accordingly, the amount in controversy presented by Plaintiff's request for restitution alone exceeds $5,000,000, exclusive of interest and costs.

20. Although Countrywide does not bear the burden to show that CAFA's exceptions to jurisdiction in 28 U.S.C. § 1332(d) do not apply, Serrano v. 180 Connect, Inc., 478 F.3d 1018 (9th Cir. 2007), none of those exceptions are applicable here.

Goodwin Procter LLP
10250 Constellation Boulevard
Los Angeles, CA 90067

## PROCEDURAL REQUIREMENTS AND LOCAL RULES

21. Removal to Proper Court. This Court is part of the "district and division" embracing the place where this action was filed – San Diego, California. 28 U.S.C. § 1446(a).

22. Removal is Timely. Countrywide is entitled to remove the State Court Action at any time up to thirty days after receipt, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief on which the action is based, or within thirty days after service of the summons, whichever is shorter. 28 U.S.C. § 1446(b). The Complaint in the State Court Action was filed on or about July 2, 2008. To the best of their knowledge, none of the three removing defendants have been served, and, even if they had been, the removal is timely because the suit was filed fewer than thirty prior to the filing of this Notice.

23. Pleadings and Process. Attached hereto as Exhibit 1 is a copy of all process, pleadings and orders in the State Court Action. See 28 U.S.C. § 1446(a).

24. Notice. Attached hereto as Exhibit 2 is a copy of the Notice of Removal to All Adverse Parties, which is being promptly served upon Plaintiff's counsel and filed with the Clerk of the Superior Court of San Diego County, California. See 28 U.S.C. §§ 1446(a), (d). Countrywide will also file with the Clerk of the Superior Court of San Diego County, California a Notice of Filing of Notice of Removal, pursuant to 28 U.S.C. § 1446(d). A copy of the Notice of Filing of Notice of Removal is attached hereto as Exhibit 3.

25. Consent to Removal. Consent to removal is not required under CAFA. 28 U.S.C. § 1453(b).

26. Signature. This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11. See 28 U.S.C. § 1446(a).

27. Bond and Verification. Pursuant to Section 1016 of the Judicial Improvements and Access to Justice Act of 1988, no bond is required in connection with this Notice of Removal. Pursuant to Section 1016 of the Act, this Notice need not be verified.

28. Based upon the foregoing, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as amended by CAFA, and the claims properly are removed to this Court.

WHEREFORE, this action should proceed in the United States District Court for the Southern District of California, as an action properly removed thereto.

Respectfully submitted,

Dated: July 22, 2008

By: [signature]

BROOKS R. BROWN
**GOODWIN PROCTER LLP**
10250 Constellation Blvd, 21st Floor
Los Angeles, CA 90067

THOMAS M. HEFFERON
(*pro hac vice* to be filed)
**GOODWIN PROCTER LLP**
901 New York Avenue, NW
Washington, DC 20001

PAUL G. MCNAMARA
**O'MELVENY & MYERS LLP**
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071

*Attorneys for Defendants: COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; and FULL SPECTRUM LENDING, a Division of Countrywide Home Loans, Inc., erroneously named as Full Spectrum Lending, Inc.*

Goodwin Procter LLP
10250 Constellation Boulevard
Los Angeles, CA 90067

Goodwin Procter LLP
10250 Constellation Boulevard
Los Angeles, CA 90067

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 10250 Constellation Blvd., Los Angeles, CA 90067.

On **July 22, 2008**, I served on the interested parties in said action the within:

**NOTICE OF REMOVAL**

Joseph J. Rego, Esq.
LAW OFFICES OF JOSEPH J. REGO
4019 Park Blvd.
San Diego, CA 92103

***Counsel for Plaintiff: ROY V. HURSH***
T: 619.293.0310
F: 619.293.0940
Jjrego2@msn.com

☐ By (ELECTRONIC MAIL) I caused the above document(s) to be transmitted to the office(s) of the addressee(s) listed above by electronic mail at the e-mail address(es) set forth above pursuant to Fed.R.Civ.P.5(d)(1*)*. *"A* Notice of Electronic *Filing (NEF) is generated automatically by the ECF system upon completion of an electronic filing. The NEF, when e-mailed to the e-mail address of record in the case, shall constitute the proof of service as* required *by Fed.R.Civ.P.5(d)(1). A copy of the NEF shall be attached to any document served in the traditional manner upon any party appearing pro se."*

And/or

by placing a true copy thereof in a sealed envelope(s) addressed as stated above and causing such envelope(s) to be deposited in the U.S. Mail at Los Angeles, California.

☑ (MAIL) I am readily familiar with this firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

☐ (OVERNIGHT DELIVERY) by depositing in a box or other facility regularly maintained by Federal Express , an express service carrier, or delivering to a courier or driver authorized by said express service carrier to receive documents, a true copy of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed as stated above, with fees for overnight delivery paid or provided for and causing such envelope(s) to be delivered by said express service carrier.

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction the service was made and that the foregoing is true and correct.

Executed on **July 22, 2008**, at Los Angeles, California.

Simone Robinson
(Type or print name)

(Signature)

LIBW/1683627.1

Exhibit 1

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**<br>STREET ADDRESS: 330 West Broadway<br>MAILING ADDRESS: 330 West Broadway<br>CITY AND ZIP CODE: San Diego, CA 92101<br>BRANCH NAME: Central<br>TELEPHONE NUMBER: (619) 450-7073 | |
| PLAINTIFF(S) / PETITIONER(S): Roy V Hursh | |
| DEFENDANT(S) / RESPONDENT(S): Countrywide Financial Corporation et.al. | |
| HURSH VS. COUNTRYWIDE FINANCIAL CORPORATION | |
| **NOTICE OF CASE ASSIGNMENT** | CASE NUMBER:<br>37-2008-00086826-CU-OR-CTL |

Judge: Steven R. Denton

Department: C-73

**COMPLAINT/PETITION FILED:** 07/02/2008

**CASES ASSIGNED TO THE PROBATE DIVISION ARE NOT REQUIRED TO COMPLY WITH THE CIVIL REQUIREMENTS LISTED BELOW**

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document.

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING

# SU...MONS
## (CITACION JUDICIAL)

SUM-100

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

CIVIL BUSINESS OFFICE 9
CENTRAL DIVISION

2008 JUL -2 A 9:15

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; COUNTRYWIDE HOME LOANS, INC., a New York Corporation; FULL SPECTRUM LENDING, INC., a California Corporation; ANGELO MOZILO, an individual; DAVID SAMBOL, an individual; and DOES 1-100, inclusive.

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
ROY V HURSH, an individual

**You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.**

**There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.**

***Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.***

***Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.***

The name and address of the court is:
*(El nombre y dirección de la corte es):*
SUPERIOR COURT OF CALIFORNIA
330 W. BROADWAY
SAN DIEGO, CA 92101

CASE NUMBER: *(Número del Caso):* 37-2008-00086826-CU-OR-CTL

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
JOSEPH J REGO SBN163183 619-293-0310
4019 PARK BOULEVARD
SAN DIEGO, CA 92103

DATE: *(Fecha)* JUL - 2 2008 Clerk, by *(Secretario)* RUSSELL TAYLOR, Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

SUPERIOR COURT ... SAN DIEGO COUNTY, CA

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☐ on behalf of *(specify)*:

under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:

4. ☐ by personal delivery on *(date)*:

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (*Name, State Bar number, and address*):
JOSEPH REGO SBN163183
4019 PARK BOULEVARD
SAN DIEGO, CA 92103

TELEPHONE NO.: 619-293-0310 FAX NO.: 619-293-0940
ATTORNEY FOR (*Name*): PLAINTIFF

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
STREET ADDRESS: 330 W. BROADWAY
MAILING ADDRESS:
CITY AND ZIP CODE: SAN DIEGO, CA 92101
BRANCH NAME:

CASE NAME:
HURSH V. COUNTRYWIDE, ET AL

*FOR COURT USE ONLY*

FILED
CIVIL BUSINESS OFFICE 9
CENTRAL DIVISION
2008 JUL -2 A 9:15
CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

**CIVIL CASE COVER SHEET**

[✓] **Unlimited** (Amount demanded exceeds $25,000)
[ ] **Limited** (Amount demanded is $25,000 or less)

**Complex Case Designation**

[ ] **Counter** [ ] **Joinder**

Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: 37-2008-00086826-CU-OR-CTL

JUDGE:

DEPT:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [✓] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (*not specified above*) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (*not specified above*) (43)

2. This case [✓] is [✓] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [✓] Large number of separately represented parties
   b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [✓] Substantial amount of documentary evidence
   d. [✓] Large number of witnesses
   e. [✓] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [✓] Substantial postjudgment judicial supervision
3. Remedies sought (*check all that apply*): a. [✓] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [✓] punitive
4. Number of causes of action (*specify*): 2
5. This case [✓] is [ ] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (*You may use form CM-015.*)

Date: 7/1/08
JOSEPH REGO
(TYPE OR PRINT NAME) ▶ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.





American LegalNet, Inc.
www.FormsWorkflow.com

CM-010

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease
    - Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

Joseph J. Rego, Esq. (SBN 163183)
4019 Park Boulevard
San Diego, California 92103
Tel: 619-293-0310
Fax: 619-293-0940
Email: jjrego2@msn.com

Attorney for Plaintiff
ROY V HURSH

FILED
CIVIL BUSINESS OFFICE 9
CENTRAL DIVISION

2008 JUL -2 A 9:14

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

SUPERIOR COURT OF CALIFORNIA,

COUNTY OF SAN DIEGO

| | |
|---|---|
| ROY V HURSH, an Individual,<br><br>Plaintiff,<br><br>v.<br><br>COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; COUNTRYWIDE HOME LOANS, INC., a New York Corporation; FULL SPECTRUM LENDING, INC., a California Corporation; ANGELO MOZILO, an individual; DAVID SAMBOL, an individual; and DOES 1-100, inclusive. | Case No. 37-2008-00086826-CU-OR-CTL<br><br>**<u>CLASS ACTION</u>**<br><br>COMPLAINT FOR<br>1. VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17500 (UNTRUE OR MISLEADING STATEMENTS)<br><br>2. VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTION 17200 (UNFAIR COMPETITION) |

1. Plaintiff, Roy V. Hursh individually, on behalf of all others similarly situated and on behalf of the general public of the State of California as a private attorney general, bring (s) this action against the defendant(s) COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; COUNTRYWIDE HOME LOANS, INC., a

New York Corporation; FULL SPECTRUM LENDING, INC., a California Corporation; ANGELO MOZILO, an individual; DAVID SAMBOL, an individual; and DOES 1-100, inclusive, and allege(s), on information and belief (except as to those allegations relating to Plaintiff himself, which are asserted on personal knowledge, as follows:

## INTRODUCTION

2. This action is brought as a class action under the provisions of the California Code of Civil Procedure section 382. Plaintiff also seeks relief as a private attorney general on behalf of the general public of the State of California and those persona and entities affected by the practice, pursuant to Business and Professions Code section 17204.

## JURISDICTION

3. This Court has jurisdiction over this action pursuant to Code of Civil Procedure section 410.10 and Business and Professions Code section 17203. On behalf of himself and all others similarly situated, Plaintiff(s) seek(s) damages in excess of the jurisdictional minimum of this Court.

## PARTIES AND VENUE

4. At all relevant times, Plaintiff Roy V Hursh ("HURSH"), an individual, resides and has resided in the County of San Diego, State of California.

5. At all relevant times, defendant Countrywide Financial Corporation ("CFC"), a Delaware corporation, has transacted and continues to transact business throughout the State of California, including in San Diego County.

6. At all relevant times, defendant Countrywide Home Loans, Inc. ("CHL"), a New York corporation, has transacted and continues to transact business throughout the State of California, including in San Diego County. CHL is a subsidiary of CFC.

7. At all relevant times, until on or about December 15, 2004, Full Spectrum Lending, Inc. (Full Spectrum"), was a California corporation that transacted business throughout the State of California, including San Diego County, and was a subsidiary of CLC. On or about December 15, 2004, Full Spectrum was merged into and became a

division of CHL. For all conduct that occurred on or after December 15, 2004, any reference in this complaint to CHL includes reference to its Full Spectrum division.

8. Defendants CFC, CHL, and Full Spectrum are referred to collectively herein as "Countrywide" or "Countrywide Defendants"..

9. At all times pertinent hereto, defendant Angelo Mozilo ("Mozilo") was the Chairman and Chief Executive Officer of CFC. Defendant Mozilo directed, authorized, and ratified the conduct of the Countrywide Defendant as set forth herein.

10. At all times pertinent hereto, defendant David Sambol ("Sambol") is and was President of CHL and since approximately September 2006 has served as the President and Chief Operating Officer of CFC. Sambol directed, authorized and ratified the conduct of CHL, and after September 2006, the Countrywide Defendants, as set forth herein.

11. Plaintiff(s) are not aware of the true names and capacities of the defendants sued as Does 1 through 100, inclusive, and therefore sues those defendants by such fictitious names. Each of these fictitiously names defendants is responsible in some manner for the activities alleged I this Complaint. Plaintiff(s) will amend to add the true names of the fictitiously named defendants once they are discovered.

12. The defendants identified in paragraphs 5 through 11, above shall be referred to collectively as "Defendants.".

13. Whenever reference is made in this Complaint to any act of any defendant(s), that allegation shall mean that each defendant acted individually and jointly with the other defendant.

14. Any allegation about acts of any corporate or other business defendant means that the corporation or other business did the acts alleged through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

15. At all relevant times, each defendant committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this

Complaint. Additionally, some or all of the defendants acted as the agent of the other defendants, and all of the defendants acted within the scope of their agency if acting as an agent of the other.

16. At all times relevant, each defendant knew or realized that the other defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Knowing or realizing that other defendants were engaging in or planning to engage in unlawful conduct, each defendant nevertheless facilitated the commission of those unlawful acts. Each defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful act, and thereby aided and abetted the other defendants in the unlawful conduct.

17. At all relevant times, Defendants have engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this Complaint. This conspiracy, common enterprise, and common course of conduct continues to present.

18. The violations of law alleged in this Complaint occurred in San Diego County and elsewhere throughout California and the United States.

**PRIVATE ATTORNEY GENERAL AND CLASS ACTION ALLEGATIONS**

19. Plaintiff(s) bring(s) this action in his individual capacity, on behalf of all persons similarly situated, and on behalf of the general public as defined in Business and Professions Code section 17204, and that portion of the general public affected by defendants' alleged wrongful conduct. Such a representative action is necessary to prevent and remedy the deceptive, unlawful and unfair practices alleged herein.

20. This action is brought and may be properly maintained as a class action pursuant to the provisions of Code of Civil Procedure section 382. Plaintiff(s) bring(s) this action of behalf of himself and all members of the class, defined as follows: any consumer who obtain any type of mortgage funding from defendants from 2000 to present. Excluded from the proposed class are defendants: any entities in which the defendants have a controlling interest; and the officers, directors, affiliates, attorneys,

heirs, predecessors and successors in interest, subsidiaries, employees, agents and/or assigns of any of the defendants.

21. The members of the class are so numerous that joinder of all members is impracticable. While the exact number of class members is unknown to plaintiffs at this time and can only be ascertained through discovery, plaintiff(s) believe that there are at least 20,000 members of the proposed class.

22. There is a well-defined community of interest among the members of the proposed class. Plaintiff(s) like all other members of the class cannot pay for their homes and/or are facing foreclosure. The factual bases of defendant's misconduct are common to all members of the class and represent a common practice of wrongful conduct resulting in damages to all members of the class.

23. There are numerous questions of law and fact common to plaintiff(s) and the members of the class and those questions predominate over any questions that may affect individual members of the class. The common questions of fact include the following:

(a)
1. Did Defendant engage in deceptive advertising?
2. Did Defendant engage in deceptive practices in the sale of complex and risky loans to consumers?
3. Did Defendant engage in deceptive underwriting to approve loans?
4. Did Defendant create a high-pressure sales environment where employees were rewarded for selling as many loans as they could without regard as to borrowers ability to re-pay?

24. Among the questions of law common to the class are the following:

(a)
1. Did defendant breach a duty to each member of the class?
2. Should defendant be enjoined from engaging in mortgage lending?
3. Are Plaintiff(s) entitled to compensatory damages?

25. Plaintiff(s)' claims are typical of the claims of the other members of the class. Plaintiff(s) and all the members of the class have sustained economic damage arising out of the common course of conduct as alleged herein.

26. Plaintiff(s) will fairly and adequately represent and protect the interests of the class. They have retained counsel with substantial experience in prosecuting consumer

class actions. Plaintiff(s) and his counsel are committed to vigorously prosecuting this action on behalf of the class and have the financial resources necessary to do so. Neither Plaintiff(s) nor his counsel have any interest adverse to this of the class.

27. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the class is impractical. Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for the individual members of the class to redress the wrongs done to them. The cost to the court system of such individual adjudication would be substantial. Individual litigation would also present the potential for inconsistent or contradictory judgments and would magnify the delay and expense to all parties and the court system in multiple trials of identical factual issues. By contrast, the conduct of this action as a class action presents fewer management difficulties, conserves the resources of the parties and the court system and protects the rights of each class member.

28. As per California Code of Civil Procedure 1021.5 Attorney fees are appropriate as follows: As per court order.

## FACTUAL ALLEGATIONS

29. This action is brought against Defendants, who engaged in false advertising and unfair competition in the origination of residential mortgage loans and home equity lines of credit (HELOCs").

30. Countrywide originated mortgage loans and HELOCs through several channels, including a wholesale origination channel and a retail origination channel. The countrywide employees who marketed, sold or negotiated the terms of mortgage loans and HELOCs in any of its origination channels, either directly or indirectly working with mortgage brokers, are referred to herein as "loan officers".

31. In countrywide's wholesale channel, loan officers in its wholesale lending division ("WLD") and Specialty Lending Group ("SLG") worked closely with a nationwide

network of mortgage brokers to originate loans. In its wholesale channel, Countrywide often did business as "America's Wholesale Lender", a fictitious business named by CHL. In Countrywide's retail channel, loan officers employed by countrywide in its Consumer Markets Division ("CMD") sold loans directly to consumers. In addition, loan officers employed by Full Spectrum Lending Division ("FSLD") sold loans directly to consumers as part of Countrywide's retail channel.

32. Countrywide maintained sophisticated electronic databases by means of which corporate management, including but not limited to defendants Mozilo and Sambol, could obtain information regarding Countrywide's loan production status, including the types of loan products, the number and dollar volume of loans, the underwriting analysis for individual loans, and the number of loans which were approved via the underwriting exceptions. Defendants used this information, together with date they received regarding the secondary market trends, to develop and modify the loan products that Countrywide offered and the underwriting standards that Countrywide applied.

33. The mortgage market changed in recent years from one in which lenders originated mortgages for retention in their own portfolios to one in which lenders attempted to generate as many mortgage loans as possible for resale on the secondary marker. The goal for lenders such as Countrywide was not only to originate high mortgage volumes but also to originate loans with above-market interest rates and other terms which would attract premium prices on the secondary market.

34. In 2004, in an effort to maximize Countrywide's profits, Defendants set out to double Countrywide's share of the national mortgage market to 30% through a deceptive scheme to mass produce loans for sale on the secondary market. Defendants viewed borrowers as nothing more than the means for producing more loans, originating loans with little or no regard to borrowers' long-term ability to afford and to sustain home ownership. This scheme was created and maintained with the knowledge, approval and ratification of defendants Mozilo and Sambol.

35. Defendants implemented this deceptive scheme through misleading marketing practices designed to sell risky and costly loans to homeowners, the terms and dangers of which they did not understand, including by (a) advertising that it was the nation's largest lender and could be trusted by consumers; (b) encouraging borrowers to refinance or obtain purchase money financing with complicated mortgage instruments like hybrid adjustable rate mortgages or payment option adjustable rate mortgage that were difficult for consumers to understand;( c) marketing these complex loan products to consumers by emphasing the very low initial "teaser" or "fixed" rates while obfuscating or misrepresenting the later steep monthly payments and interest rate increases or risk of negative amortization; and (d) routinely soliciting borrowers to refinance only a few months after Countrywide or the loan brokers with whom it has "business partnerships" has sold them loans.

36. Defendants also employed various lending policies to further their deceptive scheme and to sell ever- increasing numbers of loans, including (a) the dramatic easing of Countrywide's underwriting standards; (b) the increased use of low-or no-documentation loans which allowed for no verification of stated income or stated assets or both, or no request for income or asset information at all; ( c) urging borrowers to encumber their homes up to 100% (or more) of the assessed value ; and (d) placing borrowers in "piggyback" second mortgages in the form of higher interest rate HELOCs while obscuring their total monthly payment obligations.

37. Also to further the deceptive scheme, Defendants created a high-pressure sales environment that propelled its branch managers and loan officers to meet high production goals and close as many loans as they could without regard to the borrower ability to repay. Defendants high-pressure sales environment also propelled loan officers to sell the riskiest types of loans, such as payment option and hybrid adjustable rate mortgages, because loan officers could easily sell them by deceptively focusing borrowers attention on the low initial monthly payment or interest rate. Defendants also made arrangements with a large network of mortgage brokers to procure loans for

Countrywide and, through its loan pricing structure, encouraged these brokers to place homeowners in loans with interest rates higher than those for which they qualified, as well as prepayment penalty obligations. The system of compensation aided and abetted brokers in breaching their fiduciary duties to borrowers by inducing borrowers to accept unfavorable loan terms without full disclosure of the borrowers options and also compensated brokers beyond the reasonable value of brokerage services they rendered.

38. Countrywide received numerous complaints from borrowers claiming that they did nor understand their loan terms. Despite these complaints, Defendants turned a blind eye to the ongoing deceptive practices engaged in by Countrywide's loan officers and loan broker "business partners", as well as to the hardships created for borrowers by its loose underwriting practices. Defendants cared only about selling increasing numbers of loans at any cost, in order to maximize Countrywide's profits on the secondary market.

39. Defendants' deceptive scheme had one primary goal-to supply the secondary market with as many loans as possible, ideally loans that would earn the highest premiums. Over a period of several years, Defendants constantly expanded Countrywide's share of the consumer market for mortgage loans through a variety of deceptive practices, undertaken with the direction, authorization, and ratification of defendants Sambol and Mozilo, in order to maximize its profits from the sale of those loans to the secondary market.

40. While Countrywide retained ownership of some of the loans it originated, it sold the vast majority of its loans on the secondary market, either as mortgage-backed securities or as pools of whole loans.

41. In the typical securitization transaction involving mortgage-based securities, loans were "pooled" together and transferred to a trust controlled by the securitizer, such as Countrywide. The trust then created and sold securities backed by the loans in the pool. Holders of the securities received the right to a portion of the monthly

payment stream from the pooled loans, although they were not typically entitled to the entire payment stream. Rather, the holders received some portion of the monthly payments. The securitizer or the trust it controlled often retained an interest in any remaining payment streams not sold to security holders. These securitization could involve the pooling of hundreds or thousand of loans, and the sale of many thousands of shares.

42. Countrywide generated massive revenues through loan securitization. Its reported securities trading volume grew from 647 billion dollars in 2000, to 2.9 trillion dollars in 2003, 3.1 trillion dollars in 2004, 3.6 trillion dollars in 2005, and 3.8 trillion dollars in 2006. (These figures relate to the ostensible values given to the securities by Countrywide or investors, and include securities backed by loans made by other lenders and purchased by Countrywide.)

43. For the sale of whole loans, Countrywide pooled loans and sold them in bulk to third-party investors. The sale of whole loans generated additional revenues for Countrywide. Countrywide often sold the whole loans at a premium, meaning that the purchaser paid Countrywide a price in excess of 100% of the total principal amount of the loans included in the loan pool.

44.. The price paid by purchasers of securities or pools of whole loans varied based on the demand for the particular types of loans included in the securitization or sale of whole loans. The characteristics of the loans, such as whether the loans are prime or subprime, whether loans have an adjustable or fixed rate, or whether the loans include a prepayment penalty, all influenced the price.

45. Various types of loans and loan terms earned greater prices, or "premiums" in the secondary market. For example, investors in mortgages and mortgage backed securities have been willing to pay higher premiums for loans with prepayment penalties. Because the prepayment penalty deters borrowers from refinancing early in the life of the loan, it essentially ensures the income stream for the loan will continue while the prepayment penalty is in effect. Lenders, such as Countrywide, sought to

market loans that earned it higher premiums, including loans with prepayment penalties.

46. In order to maximize the profits earned by the sale of its loans to the secondary market, Countrywide's business model increasingly focused on finding ways to generate an ever larger volume of the types of loans desired by investors. Countrywide then developed the types of loans which would be easiest sold to the investors with no regard to the consumer.

47. Countrywide would also sell loans before they were even made. Countrywide would sell loans "forward" before the loan funded. In order to determine the best loans to sell "forward" Countrywide would examine the loans in various stages of production and examine its projected volume of production over the next several months.

48. Loans that were sold forward were sold subject to a set of stipulations between Countrywide and the purchaser. Example: Countrywide would agree on October 1 that on December 1 it would deliver 2000 adjustable rate mortgages loans with an average rate of 6.0%, half of which would be subject to a prepayment penalty, among other characteristics. None of the loans would have been made prior to October 1. Based on these stipulations regarding the characteristics of the loans to be included in the pool, an investor might agree to pay a price totaling 102.25% of the total face value of the loans. In other word the purchaser agreed in advance to pay a premium of 2.25%. Then, if the loans actually delivered on December 1 had a slightly higher or lower average interest rate, the terms of the stipulation would specify how much the final price would be adjusted.

49. The information regarding the premiums that particular loans products and terms could earn on the secondary market was forwarded to Countrywide's production department.

50. Countrywide originated as many loans as possible not only to maximize its profits on the secondary market, but to earn greater profits from servicing the mortgages it sold. Countrywide often retained the right to service the loans it

securitized and sold as pools of whole loans. The terms of the securitization and sales agreements for pools of whole loans authorized Countrywide to charge the purchasers a monthly fee for servicing the loans, typically a percentage of the payment stream on the loan.

51. Tantalized by the hug profits earned by selling loans on the secondary market, Defendants constantly sought to increase Countrywide's market share: the greater the number and percentage of loans it originated, the greater the revenue it could earn on the secondary market. Countrywide executive, including defendant Mozilo, publicly stated they sought to increase Countrywide's market share to 30% of all mortgage loans made and HELOCs extended in the country.

52. In its 2006 annual report, Countrywide trumpeted the fact that "while the overall residential loan production market in the United States has tripled in size since 2000, from $1.0 trillion to $2.9 trillion at the end of 2006, Countrywide has grown nearly three times faster, going from $62 billion in loan originations in 2000 to $463 billion in 2006."

53. In addition, Countrywide directly and indirectly motivated its branch managers, loan officers and brokers to market the loans that would earn the highest premiums on the secondary market without regard to borrowers ability to repay.

54. The secondary market affected Countrywide's pricing of products and, in order to sell more loans on the secondary market, Countrywide relaxed its underwriting standards and liberally granted exceptions to those standards. Countrywide managers and executives, including but not limited to defendants Mozilo and Sambol, had access to information that provided transparency and a seamless connection between the secondary market transactions, the loan production process and managerial and sales incentives.

**COUNTRYWIDE ENGAGED IN DECEPTIVE PRACTICES IN THE SALE OF COMPLEX AND RISKY LOANS TO CONSUMERS**

55. Countrywide offered a variety of loan products that were both financially risky and difficult for borrowers to understand, including in particular payment option and hybrid adjustable rate mortgages and second loans in the form of home equity lines of credit.

A. **The Pay Option ARM,**

56. **Plaintiff Roy V Hursh has personal knowledge of this allegations and was placed in this type of mortgage by Countrywide in 2006.**

57. Particularly after 2003, Countrywide aggressively marketed its payments option adjustable rate mortgage ("Pay option ARM") under the direction, authorization and ratification of defendants Mozilo and Sambol. The pay option ARM, which Countrywide classified as a "prime" product, is a complicated mortgage product which entices consumers by offering a very low "teaser" rate-often as low as 1%-for an introductory period of one or three months. At the end of the introductory period, the interest rate increases dramatically. Despite the short duration of the low initial interest rate, Countrywide's Pay Option ARM often include a one, two or three year prepayment penalty.

58. When the teaser rate on a Pay Option ARM expires, the loan immediately becomes an adjustable rate loan. Unlike most adjustable rate loans, where the rate can only change once every year or every sox months, the interest rate on a Pay Option ARM can change every month(if there is a change in the index used to compute the rate.

59. Countrywide's Pay option ARMs were typically tied to either the "MTA" "LIBOR" or "COFI" index. The MTA index is the 12-month average of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board. The LIBOR (London Interbank Offered Rate) index is based on rates that contributor banks in London offer each other for inter-bank deposits. Separate LIBOR indices are kept one month, six-month, and one-year periods, based on the duration of the deposit. The COFI (11th District Cost of

Funds Index) is the monthly weighted average of the interest rates paid on checking and savings accounts offered by financial institutions operating in the states of Arizona, California and Nevada.

60. Although the interest rate increased immediately after the expiration of the short period of time during which the teaser rate is in effect, Plaintiff Hursh had the option of making monthly payments as though the interest rate had not changed. Plaintiff Hursh had four different payments options during the first five years of the loan. The first option is a "minimum" payments that is based on the introductory interest rate which was 1.5%. The minimum payment, which Countrywide marketed as the "payment rate" was the lowest of the payment options present to Plaintiff Hursh. Plaintiff Hursh choose to make the minimum payment, which was $1,449.50.

61. The minimum payment of the Pay Option ARM usually is less than the interest accruing on the loan. The unpaid interest was added to the principal amount of Plaintiff Hursh's loan, resulting in a negative amortization. The minimum payment remained the same for the first year and then began to increase substantially. By March 2008 the payment was $3,189.51 approximately 2.5 times the original payment, which resulted in "payment shock" for Plaintiff Hursh.

62. However the loan balance on his Pay Option ARM also has a negative amortization cap, 115% of the original principal of the loan. When the balance hits the cap, the monthly payment will immediately raise to fully amortizing level (i.e., all payments after the date the cap is reached must be sufficient to pay off the new balance over the remaining life of the loan). When this happens, Plaintiff Hursh will experience significant payment shock. Plaintiff's loan balance at the time of inception was $420,000.00, in just two years the balance is already $442,848.23 and increasing each month.

63. Instead of making the minimum payment as Plaintiff Hursh did, a borrower has the option of making an interest-only payment for five years. The borrower then experience payment shock when the payment recasts to cover both the principal and

interest for the remaining term of the loan.

64. Example of Pay Option ARM Loan: initial balance of $460,000.00, a teaser rate of 1%, and a margin of 2.9%. After the teaser rate expired, based on the 1-month LIBOR rate as of the date the borrower obtained the loan, the interest rate would increase to 7.00%. Assuming the 7.00% rate remained and the borrower chose to make the minimum payment for as long as possible the payments would be: (approximately rounded to the nearest dollar)

A. $1,480.00 per month for the first year.

B. $1,591.00 per month for the second year

C. $1,710.00 per month for the third year

D. $1,839.00 per month for the fourth year

E. $1,975.89 per month for the fifth year

F. $3,748.00 per month for the remainder of the life of the loan.

65. Once the payments have reached $3,748.00 this Pay Option ARM will have negatively amortized such that the balance of the loan will have increased to a staggering $523,793.00. The borrower is now forced to make a payment more than two and half times greater than the initial payment and likely unable to refinance unless the home has increased in value at least commensurately with the increased loan balance.

66. During the underwriting process, Countrywide did not consider whether Plaintiff Hursh would be able to afford such payment shock.

67. Nearly all Countrywide's Pay Option ARM borrowers will experience payment shock. As of December 31, 2006, almost 88% of the Pay Option ARM portfolio held by Defendants consisted of loans that had experienced some negative amortization. The percentage increased to 91% as of December 31, 2007.

68. Countrywide sold thousands of Pay Option ARMs, wither through it branches or through brokers.

69. These loans were highly profitable. Countrywide had a gross profit margin of approximately 4% on Pay Option ARMs, compared to 2% on mortgages guaranteed by

the Federal Housing Administration.

70. Countrywide retained ownership of a number of loans for investment purposes, including thousand of Pay Option ARMs. Countrywide reported the negative amortization amounts on these Pay Option ARMs as income on its financial statements. The negative amortization "income" earned by Countrywide totaled 1.2 billion dollars by the end of 2007.

71. Moreover, Pay Option ARMs with higher margins could be sold for a higher premium on the secondary market, because the higher margins would produce a greater interest rate and therefore a larger income stream. To insure an abundant stream of such loans, Countrywide pushed its loan officers to sell Pay Option ARMs and paid loan brokers greater compensation for selling a Pay Option ARM with a higher margin, or above-par rate, thus encouraging them to put consumers into higher cost loans. Countrywide also used a variety of deceptive marketing techniques to sell its Pay Option ARM to consumers.

72. Countrywide deceptively marketed the Pay Option ARM by aggressively promoting the teaser rate. Television commercials emphasized that the payment rate could be as low as 1% and print advertisements lauded the extra cash available to borrowers because of the low minimum payment on the loan. Television advertisements did not effectively distinguish between the "payment rate" and the interest rate on the loans, and any warning about potential negative amortization in Countrywide's print advertisements were buried in densely written small type.

73. Borrowers, enticed by the low teaser rate, were easily distracted from the fine print in the loan documentation and did not fully understand the terms or the financial implications of Countrywide's Pay Option ARMs.

74. When a borrower obtained a Pay Option ARM from Countrywide, the only initial monthly payment amount that appeared anywhere in his loan documentation was the minimum payment. Countrywide assumed that was the payment the Plaintiff Hursh or any other borrower would make. Thus Plaintiff Hursh or any other borrower did not

know the monthly payments necessary to make a payment that would cover accruing interest, until he received the first statement after the expiration of the teaser rate, well after all loan documentation was signed.

75. Countrywide and the brokers it accepted as it "business partners" misrepresented or obfuscated the true terms of the Pay Option ARMs offered by Countrywide, including but not limited to misrepresenting or obfuscating the amount of time that the interest rate would be fixed for the loan, misrepresenting or obfuscating the risk of negative amortization and the fact that the payment rate was not the interest rate, and misrepresenting or obfuscating that the minimum payment would not apply for the life of the loan.

76. Countrywide and its business partner brokers also misrepresented ir obfuscated how difficult it would be for borrowers to refinance a Pay Option ARM loan. In f ct, after making only the minimum payments, because of negative amortization the borrower likely would not be able to refinance the loan unless the home serving as security has increased in value. This is particularly true in cases for borrowers whose loans had a very high loan-to-value ration. This is true in the Plaintiff Hursh, he is unable to refinance the loan.

77. Countrywide and its business partners often misrepresented or obfuscated the fact that a particular Pay Option ARM included a prepayment penalty and failed to explain the effect that making only the minimum payment would have on the amount of the prepayment penalty. If Plaintiff Hursh had sought to refinance after having make only the minimum payments, the negative amortization of his loan caused the prepayment to increase. Prepayment penalties typically equal six months worth of accrued interest. As a negative amortization cause the loan principal to increase, it also causes an increase in the amount of interest that accrues each month, thereby increasing the prepayment penalty.

78. Countrywide and its business partner brokers also represented that the prepayment penalty could be waived if the borrower refinanced with Countrywide.

However, Countrywide sold most of the loans and therefore lost the authority to waive the penalty.

B. **Hybrid ARM Loans**

79. Countrywide offered "Hybrid" ARM Loans. These loans have a fixed rate for a period of 2,3,5,7, or 10 years, and then an adjustable rate for the remaining loan period. The products described below were offered with the approval of defendants Sambol and Mozilo.

(1) 2/28 and 3/27 ARMs

80. Countrywide typically offered "2/28" Hybrid ARMs through its Full Spectum Lending Division. These 2/28 ARM loans have low, fixed interest rates for the first two years (the "2" in "2/28"). The loans often required interest-only payments during the period the initial rate was in effect, or sometimes for the first five years of the loan.

81. After the initial rate expires, the interest rate can adjust once every six months for the next 28 years. During this period , the interest rate is typically is determined by adding a margin to the one-year LIBOR index, except that the amount the interest rate can increase at one time may be limited to 1.5%. Because the initial rate is set independent of the index, the payment increase can be dramatic, particularly is the loan called for interest-only payments for the first two or five years.

82. Countrywide also offered "3/27" ARMs, which operate similarly to 2/28 ARMs, except that the low initial rate is fixed for three rather than two years, and the interest rate adjusts for 27 rather than 28 years.

83. Countrywide underwrote 2/28 and 3/27 ARMs based on the payment required while the initial rate was in effect, without regard to whether the borrower could afford the loan thereafter. And, like the Pay Option ARMs, Countrywide's 2/28 and 3/27 ARMs typically contain prepayment penalties.

84. A borrower with a 2/28 ARM, like a borrower with a Pay Option ARM, is subjected to steadily increasing payments as well as payment shock. Example: A Countrywide borrower obtained a 2/28 ARM for $570,000.00, with an initial rate of

8.95% for the first two years. Thereafter the interest rate was calculated by adding a margin of 7.95% to the six-month LIBOR index. The promissory note for this 2/28 ARM provides that the interest rate can never be lower 8.95% and can go as high as 15.95%. Based on the LIBOR rate that applied at the time the borrower received the loan and the terms of the note governing interest rate increases, the anticipated payment schedule was:

A. $4566.00 per month for two years

B. $5142.00 per month for six months

C. $5,766.00 per month for six months; and

D. Payments of $6,404.00 per month or more thereafter.

85. This borrower's monthly payments of this 2/28 ARM will increase by approximately 40% just during 12 months between the end of the second year and beginning of the fourth year of the loan.

2. 5/1,7/1, and 10/1 ARMs

86. Countrywide also offered 5/1,7/1, and 10/1 "interest-only" loans. Marketed having "fixed" or "fixed period" interest rates, these loans carried a fixed rate for the first 5,7, or 10 years respectively. These loans were underwritten based on the initial rate, interest only payment until the end of 2005. However when the fixed period expires, the interest rate adjusts once per year and is determined by adding a margin to the index. The monthly payments dramatically increase after the interest-only period because payments over the remaining 25,23 or 20 years are fully amortized to cover both principal and interest.

87. Collectively 2/28, 3/27, 5/1. 7/1 and 10/1 ARMs will be referred to herein as "Hybrid ARMs".

88. Countrywide marketed Hybrid ARMs by emphasing the low monthly payment and low "fixed" initial interest rate. Countrywide and its business partner brokers misrepresented or obfuscated the true terms of these loans, including but not limited to misrepresenting or obfuscating the amount of time that the fixed rate would be in effect,

misrepresenting the fact that the interest rate on the loans are adjustable rather than fixed, and obfuscating or misrepresenting the amount by which payments could increase once the initial fixed rate expired.

89. Countrywide and its business partners also often misrepresented the fact that Hybrid ARMs included prepayment penalties.

90. Countrywide and its business partners also misrepresented how difficult it might be for borrowers to refinance the Hybrid ARMs. Because the loan had usually increased in value and the unless the home had increased substantially there would be no equity in the home.

**C. Home Equity Lines of Credit**

91. Countrywide also aggressively marketed HELOCs, particularly to borrowers who had previously obtained or were in possession of obtaining a first mortgage loan from Countrywide. Defendants referred to such HELOCs as "piggies" or "piggyback loans" and referred to simultaneously funded first and HELOCs as "combo loans". The first loan typically covered 80% of the appraised value of the home securing the mortgage, while the HELOC covered any of the home's remaining value up to (and sometimes exceeding) 20%. Thus, the HELOC and the first loan together encumbered 100% or more of a home's appraised value.

92. Under the terms of the piggyback HELOCs, borrowers received monthly bills for interest only payments for the first five years of the loan term during which time they could also tap any unused amount of the equity line. This was called the "draw period". 93. Because Countrywide offered HELOCs as piggybacks to Pay Option and Hybrid ARMs, 100% or more of a property's appraised value could be encumbered with loans that required interest-only payments or allowed for negative amortization.

93. Countrywide typically urged borrowers to draw down the full line of credit when HELOC initially funded. This allowed Countrywide to earn as much interest as possible on the HELOCs it kept in its portfolio and helped generate a payment stream for HELOCs sold on the secondary market.

94. Upon the end of the draw period, the HELOC notes generally required borrowers to repay the principal and interest in fully amortizing payments over a period of fifteen years. A fully drawn HELOC was therefore functionally a 20 or 25 year closed end mortgage. However, Countrywide did not provide borrowers with any documents or other material to help them calculate the principal and interest payments that would be due after the draw, or interest-only period.

95. Countrywide HELOCs were underwritten not to the fully amortizing payment, but to the interest-only payments during the draw period. Countrywide typically charged an early termination fee for HELOCs closed before three years, and sometimes would charge a monthly fee for HELOCs where the balance fell below a specified amount,

96. A borrower with an interest-only or a negatively amortizing loan faces even greater payment shock if he or she has a fully drawn HELOC.

**COUNTRYWIDE EASED AND DISREGARDED UNDERWRITING STANDARDS IN ORDER TO INCREASE ITS MARKET SHARE**

97. Driven by its push for market share, Countrywide did whatever it took to sell more loans, faster-including by easing it underwriting criteria and disregarding the minimal underwriting criteria it claimed it required. By easing and disregarding its underwriting criteria, Countrywide increased the risk the that borrowers would lose their homes. Defendant Mozilo and Sambol actively pushed for easing Countrywide's underwriting standards and documentation requirements, allowed the liberal granting of exceptions to those already eased standards and requirements, and received reports detailing the actual underwriting characteristics and performance of the loans Countrywide funded.

**Countrywide's low-and-No-Documentation Loans**

98. Typically, lenders require borrowers seeking loans to document their income, by providing W-2, 1099's or tax returns, as well as assets. Countrywide however disregarded such documentation requirements with respect to its riskiest loan products and introduced a variety of reduced or no documentation loan programs that eased and

quickened the loan origination process. The vast majority of the Hybrid ARMs and nearly all of the Pay Option ARMs originated by Countrywide were reduced or no documentation loans. Plaintiff Hursh has personal knowledge of this allegation. Countrywide accepted stated income from the Plaintiff, nothing was verified.

99. These low-and no-documentation programs, enable Countrywide to process loans more quickly and therefore make more loans. Stated income also encouraged the overstating of income-loan brokers and officers either overstated the borrowers income with their knowledge, or led the borrower into overstating his or her income without explaining the risk of default that the borrower would face with a loan he Countrywide loan officers would tell a borrower that based upon their credit score they needed to say that this was their income. Many borrowers agreed by stating that was their income. Plaintiff Hursh has personal knowledge of this allegation.

100. For stated income loans, it became a standard practice for loan processors and underwriters to check www.salary.com to see if a state income was within a reasonable range, with more tolerances given to California salaries. Because loan officers knew this, they would look the parameters up prior to submitting to underwriting so they had the correct state income.

101. Countrywide also relaxed the traditional underwriting standards in order to produce more loans for the secondary market. Countrywide relaxed the credit score requirement so more borrowers qualified for the stated income programs.

102. Countrywide further relaxed the loan-to value ratios and the debt-to income ratios to produce more loans.

103. Countrywide approved loans that it knew to be high risk, and therefore likely to end up in default, by ignoring its own minimum underwriting. Based upon the proposed loan terms and the borrower's financial and credit information, Countrywide's computerized underwriting system ("CLUES") issued a loan analysis report that rated the consumer's credit and ability to repay the loan, and also indicated whether a proposed loan was in compliance with Countrywide's underwriting guidelines.

104. The CLUES result was only a recommendation, not a final decision. The role of the underwriter was to verify the information and ultimately decide whether to approve the loan. Underwriters could overcome potential violations or other underwriting issued flagged by CLUES by adding on "compensating factors", such as letter from the borrowers addressing the problems.

105. Underwriters were under intense pressure to process and fund as many loans as possible. They were expected to process 60 to 70 loans per day, as the pressure to produce loans increased, underwriters, their superiors, branch managers and regional vice presidents were given the authority to grant exceptions to the CLUES recommendations. Even if CLUES denied a loan, the underwriter could override the decision and approve the loan if he or she obtained approval from their supervisor.

106. Because of the intense pressure, underwriters had to justify why they were not approving loans.

107. To attract more business Countrywide promoted its relaxed underwriting standards and ready grants of exceptions to brokers. Countrywide stated that its "Specialty Lending Group's experienced and knowledgeable loan experts are empowered to review all loan packages, make sound credit decisions and provide quality lending solutions-yes, even for 'hard to close' loans".

108. Countrywide compromised it underwriting standards even further by risk layering, i.e. combining high risk loans with one or more relaxed underwriting standards. Countrywide was well aware that layered risk created a greater likelihood that borrowers would lose their homes.

109. Driven by its push for market share, Countrywide did whatever it took to sell more loans faster-including engaging in a number of deceptive marketing practices under the direction and with the ratification of defendants Mozilo and Sambol.

**<u>COUNTRYWIDE DECEPTIVELY LULLED BORROWERS INTO BELIEVING THAT IT WAS A "TRUSTED ADVISOR" LOOKING OUT FOR BORROWERS BEST</u>**

**INTEREST.**

110. Countrywide sought to induce borrowers into believing that it was looking out for their best interest through various types of solicitations. Countrywide published television, radio and print advertising, for example claiming it was a "Company you could trust", "join the millions of homeowners who have trusted Countrywide". Countrywide capitalized on its status as the "number one mortgage broker". Countrywide also solicited existing Countrywide customers with letters and emails pushing their Pay Option ARMs claiming it was in their best interest.

111. In order to produce more loans for the secondary market Countrywide encouraged serial refinancing to its existing customers. Countrywide misled these borrowers by pushing their Pay Option ARMs and their Hybrid ARMs. Countrywide knew that borrowers who could not afford the inevitable payment increase on such loans and who were unable to refinance would be at greater risk for losing their homes.

112. Because the Pay Option ARM and Hybrid ARM start with lower monthly payments and interest rate and the complex nature of the loan, Countrywide was easily able to sell this type of loan to the borrower with no regard as to the borrowers ability to repay once it adjusted. Countrywide's approach was to "sell the payment", borrowers were eager to accept the Pay Option ARMs because they did not understand them and they were not explained by Countrywide.

113. Borrowers subjected to any of the deceptive marketing practices would not of fully understood the true risks and likely unaffordability of their Pay Option or Hybrid ARMs. Many borrowers did not read their loan documents and disclosures before signing. Countrywide often makes borrowers sign a large stack of documents without providing borrower time to read them or have them explained. Even if a borrower did read the documents they did not fully understand them.

114. Countrywide's tricky advertising focused borrower on the short term low payments not on the true terms of the loans. Countrywide telemarketer were given scripts that led consumers away from any questions regarding the true terms of the

loans.

115. If a borrower was able to understand the payment would increase and questioned the ARM, he or she was misled another way, Countrywide would represent that the value of their home would increase, thus creating equity to obtain a loan with better terms. However Countrywide failed to clearly explain the prepayment penalty, nor the fact that the home was probably already encumbered 100% and the borrower was in a negative amortization loan.

116. Countrywide received numerous complaints from borrowers who claimed they had not been told about the prepayment penalty or that the loan officer had promised that they would not be one, Defendants turned a blind eye to borrowers.

117. Countrywide touted its low documentation requirements, urging borrowers to get "fastrack" loans so that they could get cash more quickly. However many borrowers who obtained these loans possessed sufficient documentation to qualify for full document mortgages, and some submitted that documentation to their loan offices or to one of Countrywide's business partner brokers. In emphasizing the ease, speed and availability of reduced or no document loans, Countrywide concealed the fact that borrowers could qualify for a lower rate or reduced fees if they elected to apply for a mortgage by fully documenting their income and assets.

118. Countrywide misrepresented the terms of HELOCs, including without limitation by failing to inform the borrower that he or she would not have access to additional credit because he or she was receiving a full draw or that the monthly payment on the HELOC was interest-only and the borrower therefore would not ve able to draw additional funds on the HELOC at a later date.

**IN ORDER TO INCREASE MARKET SHARE, DEFENDANTS CREATED A HIGH-PRESSURE SALES ENVIRONMENT WHERE THE EMPLOYEES WERE REWARDED FOR SELLING AS MANY LOANS AS POSSIBLE WITHOUT REGARD TO BORROWERS ABILITY TO REPAY.**

119. Despite touting itself as a lender that cared about its borrowers, Countrywide

was in essence, a mass production loan factory set up to produce an ever-increasing stream of loans without regard to borrowers ability to repay the loans and sustain home ownership. In order to provide an endless supply of loans for the secondary market, Defendants pressured Countrywide employed involved in the sale and processing of the loans to produce as many loans as possible, as quickly as possible and at the highest price.

120. Defendants created this pressure through a compensation system, which predictably led employees to disregard Countrywide's minimal underwriting guidelines and to originate loans without regard to their sustain ability.. Countrywide's compensation system also motivated its loan officers to engage in the deceptive marketing practices in the preceding sections. If any of the employees failed to produce the numbers expected by Countrywide they were terminated.

**AS PART OF THE DECEPTION, COUNTRYWIDE COMPENSATED ITS BUSINESS PARTNER BROKERS AT A HIGHER RATE FOR MORE PROFITABLE LOANS, WITHOUT CONSIDERATION OF SERVICES ACTUALLY PERFORMED BY THE BROKERS.**

121. In California, a mortgage broker owes his or her client a fiduciary duty. A mortgage broker is customarily retained by a borrower to act as the borrower's agent in negotiating an acceptable loan. All persons engaging in this business in California are required to obtain real estate licenses and to comply statutory requirements. Among other things, the mortgage broker has an obligation to make a full and accurate disclosure of the terms of a loan to borrowers, particularly those that might affect the borrowers decision, and to act always in the utmost good faith toward the borrower and to refrain from obtaining any advantage over the borrower.

122. Countrywide paid brokers compensation in the form of yield spread premiums or rebates to induce brokers to place borrowers in loans that would earn Countrywide the greatest profit on the secondary market, regardless of whether the loans were in the best interest of, or appropriate for, the borrowers. In fact, the

mortgages that earned Countrywide the highest profit, and therefore would pay the highest rebates or yield spread premiums to brokers, often were not in the best interest of the borrower.

123. Countrywide would also pay rebates in exchange fora broker providing an adjustable rate loan with a high margin. Countrywide would provide an additional rebate to brokers if they were able to induce a borrower to obtain a line of credit.

124. In order to maximize their compensation from Countrywide, brokers misled borrowers about the true terms of Pay Option and Hybrid ARMs, misled borrowers about their ability to refinance before the rates or payments on their loans increased, misled borrowers about the cost of reduced and no document loans, and misled borrowers regarding the terms of HELOCs. Plaintiff Hursh has personal knowledge of this allegation.

125. Borrowers often did not realize that their loans contained terms that were unfavorable to them and provided greater compensation to their brokers specifically as payment for those unfavorable terms. An origination fee or other charges imposed by a broker are either paid by the borrower or financed as part of the loan. In contrast, rebates, and yield spread premiums are not part of the principal of the loan and instead are paid separately by Countrywide to the broker.

126. Countrywide closely monitored and controlled the brokers with whom it worked. Countrywide required brokers it accepted as "business partners" to cooperate and provide all information, documentation and reports requested so that Countrywide could conduct a review of the broker and its operations. In addition, Countrywide required the brokers to warrant and represent that all loans were closed using documents wither prepared or expressly approved by Countrywide.

**AS A RESULT OF DEFENDANT'S DECEPTIVE SCHEME THOUSANDS OF CALIFORNIA HOMEOWNERS HAVE EITHER LOST THEIR HOMES OR FACE FORECLOSURE AS THE RATE OF THEIR ADJUSTABLE MORTGAGE RESET.**

127. Due to Countrywide's lack of meaningful underwriting guidelines and risk

layering, Countrywide deceptive sales tactics, high-pressure sales environment and the complex nature of it Pay Option and Hybrid ARMs, a large number of Countrywide loans are in default and foreclosure, or are headed in that direction. Many of its borrowers have lost their homes, or are facing foreclosure because they cannot afford the payment shock and their properties are too heavily encumbered for them to be able to refinance and pay prepayment penalties. Plaintiff Hursh has personal knowledge of this allegations and currently received a NOTICE OF DEFAULT.

128. The national pace of foreclosures is skyrocketing. In the month of May 2008 approximately 20,000 Californians lost their homes to foreclosure, and approximately 72,000 California homes were in default. This represents an 81% increase from May 2007.

129. Countrywide's mortgages account for a large percentage of these delinquencies and foreclosures. Countrywide's 10-K filed in February 2008, estimated that as of December 31, 2007, a staggering 27.29% of it non-prime mortgages were delinquent. An October 2007 report prepared by Credit Suisse estimated that Countrywide's delinquency and foreclosure rates are likely to double over the next two years.

130. This may well understate the extent of the crisis facing California Homeowners with Countrywide mortgages, as more and more Pay Option ARMs go into delinquency.

**FIRST CAUSE OF ACTION AGAINST ALL DEFENDANT**

**VIOLATIONS OF BUSINESS AND PROFESSIONS SECTION 17500**

**(UNTRUE OR MISLEADING STATEMENTS)**

131. Plaintiff Hursh reallege and incorporate by reference all paragraphs above, as though fully set forth in this cause of action.

132. Defendants violated and continue to violate Business and Professions Code section 17500 by making or disseminating untrue or misleading statements, or by causing untrue or misleading statements to be made or disseminated, in or from

California, with the intent to induce members of the public to enter into mortgage loan or home equity line of credit transactions secured by their primary residences. These untrue and misleading statements include but are not necessary limited to:

a. Statements that Countrywide was a mortgage loan expert that could be trusted to help borrowers obtain mortgage loans that were appropriate to their financial circumstances, as described in paragraphs 110 through 115 above;

b. Statements regarding the terms and payment obligations of Pay Option ARMs offered by Countrywide, including statements that the initial payment rate was the interest rate, statements regarding the duration of the initial payments, statements regarding the risks associated with such loans as described in Paragraph 56 through 78, Plaintiff Hursh has personal knowledge of these statements.

C. Statements regarding the terms and payment obligations of Hybrid ARMs offered by Countrywide, including statements regarding the duration of the initial interest rate, and statements obfuscating the risks associated with such mortgage loans as described in paragraphs 79-90.

d. Statements regarding the terms and payments obligations of HELOCs, as described in paragraphs 91-96.

e. Statements that borrowers with Pay Option and Hybrid ARMs offered by Countrywide would be able to refinance the mortgage loans before the interest rates reset, when in fact they most likely could not, as described in paragraphs 56-90.

f. Statements regarding prepayment penalties on Pay Option and Hybrid ARMs offered by Countrywide, including statements that the mortgage loans did not have prepayment penalized, when in fact they did and statements that prepayment penalties could be waived, when in fact they could not as described in paragraphs 56 through 130.

g. Statements regarding the costs of reduced or no documentation mortgage loans as described in paragraphs 98-100.

h. Statements regarding the benefits or advisability of refinancing mortgage

loans with Pay Option and Hybrid ARMs offered by Countrywide as described in paragraph 110 through 115.

133. Defendants knew, or by the exercise of reasonable care should have known, that these statements were untrue and misleading at the time they were made.

**SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS**

**VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTION 17200**

**(UNFAIR COMPETITION)**

134. Plaintiff Hursh realleges and incorporates by reference all paragraphs above, as though fully set forth in this cause of action.

135. Defendants have engaged in and continue to engage in, acts or practices that constitute unfair competition, as that term is define in Section 17200 of the Business and Professions Code. Such acts or practices include, but are not limited to, the following:

a. Creating and maintaining a deceptive scheme to mass produce loans for sale on the secondary market as described in paragraphs 29 through 130.

b. Making untrue or misleading representations that Countrywide would be trusted to sell borrowers mortgage loans that were appropriate to the financial circumstances as described in paragraph 110 through 115.

C. Making untrue or misleading representations regarding the terms and payments obligations of Countrywide's Pay Option and Hybrid ARMs and HEOLCs as described in paragraphs 56 through 96.

d. Making untrue or misleading representations regarding the costs of reduced or no documentation mortgage loans as described in paragraphs 98-100.

e. Making untrue or misleading representations regarding the true likelihood or circumstances under which borrowers would be able to refinance the ARM or HELOC as described in paragraph 110 to 115.

f. Soliciting borrowers to refinance mortgage loans by misrepresenting the benefits of doing so or by misrepresenting or obfuscating the fact that in doing so

borrower will incur a prepayment penalty as described in paragraphs 110 through 115.

g. Making loans and extending HELOCs without regard to whether borrowers would be able to afford monthly payments on those loans or HELOGs after the expiration of the initial interest rate on the loans or the draw periods on the HELOGs as described in paragraphs 56 through .

h. Aiding and abetting the breach of fiduciary duty owed by mortgage brokers to California borrowers, as described in paragraphs 121 through 126

I. Failing to provide borrowers with documents sufficient to inform them of their payment obligations with respect to fully drawn HELOGs as described in paragraphs 91 to 96.

j. Paying compensation to mortgage brokers that was not reasonably related to the value of the brokerage services they performed, as described in paragraphs 121 to 126.

k. Violating section 17500 of the Business and Professions Code as described in the First Cause of Action, above.

//

## PRAYER FOR RELIEF FOR ALL CAUSES OF ACTION

1. For certification of this action as a plaintiff class action as set forth hereinabove.

2. For an award of compensatory damages in an amount not less than 5,000,000.00 or according to proof at trial.

3. For punitive damages in an amount not less than 5,000,000.00 or an amount sufficient to deter, punish and make an example of defendants according to proof at trial.

4. For an order requiring defendant to make restitution of all revenues, earning, compensation and benefits obtained as a result of its wrongful conduct.

5. For an award of costs and attorneys' fees as permitted by law as California Code of Civil Procedure 1021.5.

6. For such other and further relief as the Court deems just and proper.

Dated: 7/1, 2008

JOSEPH J REGO
ATTORNEY FOR PLAINTIFFS

## VERIFICATION

I, Plaintiff ROY V HURSH, an Individual , am the Plaintiff in this action. I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters that are therein stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: June 30, 2008

By: ________________________

Plaintiff ROY V HURSH, an Individual

Exhibit 2

BROOKS R. BROWN (SBN 250724)
*bbrown@goodwinprocter.com*
**GOODWIN PROCTER LLP**
10250 Constellation Blvd, 21st Floor
Los Angeles, CA 90067
Telephone: 310.788.5100
Facsimile: 310.286.0992

THOMAS M. HEFFERON (*pro hac vice* to be filed)
*thefferon@goodwinprocter.com*
**GOODWIN PROCTER LLP**
901 New York Avenue, NW
Washington, DC 20001
Telephone: 202.346.4000
Facsimile: 202.346.4444

PAUL G. MCNAMARA (SBN 106080)
*pmcnamara@omm.com*
**O'MELVENY & MYERS LLP**
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: 213.430.6000
Facsimile: 213.430.6407

*Attorneys for Defendants: COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; and FULL SPECTRUM LENDING, a Division of Countrywide Home Loans, Inc., erroneously named as Full Spectrum Lending, Inc.*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SAN DIEGO DIVISION

| | |
|---|---|
| ROY V. HURSH, an individual<br><br>Plaintiff,<br><br>v.<br><br>COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; FULL SPECTRUM LENDING, INC.; ANGELO MOZILO; DAVID SAMBOL; and DOES 1-100, inclusive,<br><br>Defendant. | Case No. ____________________<br><br>**DEFENDANTS' NOTICE OF REMOVAL TO ADVERSE PARTIES**<br><br>Date:<br>Time:<br>Courtroom:<br>Judge: |

PLEASE TAKE NOTICE, that on July 22, 2008, defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., and Full Spectrum Lending, a Division of Countrywide Home Loans, Inc., erroneously named as Full Spectrum Lending, Inc. (collectively, "Countrywide") filed a Notice of Removal of this action in the United States District Court for the Southern District of California. A true and correct copy of the Notice of Removal along with all exhibits, has been served contemporaneously upon you.

Respectfully submitted,

Dated: July 22, 2008

By: ______________________

BROOKS R. BROWN
**GOODWIN PROCTER LLP**
10250 Constellation Blvd, 21st Floor
Los Angeles, CA 90067

THOMAS M. HEFFERON
*(pro hac vice to be filed)*
**GOODWIN PROCTER LLP**
901 New York Avenue, NW
Washington, DC 20001

PAUL G. MCNAMARA
**O'MELVENY & MYERS LLP**
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071

*Attorneys for Defendants: COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; and FULL SPECTRUM LENDING, a Division of Countrywide Home Loans, Inc., erroneously named as Full Spectrum Lending, Inc.*

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 10250 Constellation Blvd., Los Angeles, CA 90067.

On **July 22, 2008**, I served on the interested parties in said action the within:

**DEFENDANTS' NOTICE OF REMOVAL TO ADVERSE PARTIES**

Joseph J. Rego, Esq.
LAW OFFICES OF JOSEPH J. REGO
4019 Park Blvd.
San Diego, CA 92103

***Counsel for Plaintiff: ROY V. HURSH***
T: 619.293.0310
F: 619.293.0940
Jjrego2@msn.com

☐ By (ELECTRONIC MAIL) I caused the above document(s) to be transmitted to the office(s) of the addressee(s) listed above by electronic mail at the e-mail address(es) set forth above pursuant to Fed.R.Civ.P.5(d)(1*)*. *"A* Notice of Electronic *Filing (NEF) is generated automatically by the ECF system upon completion of an electronic filing. The NEF, when e-mailed to the e-mail address of record in the case, shall constitute the proof of service as* required *by Fed.R.Civ.P.5(d)(1). A copy of the NEF shall be attached to any document served in the traditional manner upon any party appearing pro se."*

And/or

by placing a true copy thereof in a sealed envelope(s) addressed as stated above and causing such envelope(s) to be deposited in the U.S. Mail at Los Angeles, California.

☑ (MAIL) I am readily familiar with this firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

☐ (OVERNIGHT DELIVERY) by depositing in a box or other facility regularly maintained by Federal Express , an express service carrier, or delivering to a courier or driver authorized by said express service carrier to receive documents, a true copy of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed as stated above, with fees for overnight delivery paid or provided for and causing such envelope(s) to be delivered by said express service carrier.

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction the service was made and that the foregoing is true and correct.

Executed on **July 22, 2008**, at Los Angeles, California.

Simone Robinson
(Type or print name)

Simone C. Robinson/ams
(Signature)

LIBA/1917169.1

BROOKS R. BROWN (SBN 250724)
*bbrown@goodwinprocter.com*
**GOODWIN PROCTER LLP**
10250 Constellation Blvd, 21st Floor
Los Angeles, CA 90067
Tel.: 310.788.5100
Fax: 310.286.0992

THOMAS M. HEFFERON (*pro hac vice* to be filed)
*thefferon@goodwinprocter.com*
**GOODWIN PROCTER LLP**
901 New York Avenue, NW
Washington, DC 20001
Telephone: (202) 346-4000
Facsimile: (202) 346-4444

PAUL G. MCNAMARA (SBN 106080)
*pmcnamara@omm.com*
**O'MELVENY & MYERS LLP**
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

*Attorneys for Defendants: COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; and FULL SPECTRUM LENDING, a Division of Countrywide Home Loans, Inc., erroneously named as Full Spectrum Lending, Inc.*

Goodwin Procter LLP
10250 Constellation Boulevard
Los Angeles, CA 90067

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN DIEGO

CENTRAL DIVISION

| | |
|---|---|
| ROY V. HURSH,<br>Plaintiff,<br>v.<br>COUNTRYWIDE FINANCIAL CORP. *et al.*,<br>Defendants. | No. 27-2008-00086826-CU-OR-CTL<br><br>**DEFENDANTS' NOTICE OF FILING OF NOTICE OF REMOVAL**<br><br>Dept: 73<br>Judge: Steven R. Denton<br><br>Complaint Filed: July 2, 2008 |

PLEASE TAKE NOTICE, that defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc. and Full Spectrum Lending, a Division of Countrywide Home

Loans, Inc., erroneously named as Full Spectrum Lending, Inc., have this date filed in the United States District Court for the Southern District of California a Notice of Removal of the above-captioned case from the Superior Court for San Diego County, California to said District Court, pursuant to 28 U.S.C. §§ 1332 and 1441. A copy of the Notice is attached hereto. Furthermore, pursuant to 28 U.S.C. § 1446(d), this matter shall proceed no further unless and until the case is remanded to this Court by the United States District Court.

Respectfully submitted,

Dated: July 22, 2008

[signature]
BROOKS R. BROWN
**GOODWIN PROCTER LLP**
10250 Constellation Blvd.
Los Angeles, CA 90067

THOMAS M. HEFFERON
(*pro hac vice* to be filed)
**GOODWIN PROCTER LLP**
901 New York Avenue, NW
Washington, DC 20001

PAUL G. MCNAMARA
**O'MELVENY & MYERS LLP**
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071-2899

*Attorneys for Defendants: COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; and FULL SPECTRUM LENDING, a Division of Countrywide Home Loans, Inc., erroneously named as Full Spectrum Lending, Inc.*

LIBW/1683469.1

Goodwin Procter LLP
10250 Constellation Boulevard
Los Angeles, CA 90067

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 10250 Constellation Blvd., Los Angeles, CA 90067.

On **July 22, 2008**, I served on the interested parties in said action the within:

**DEFENDANTS' NOTICE OF FILING OF NOTICE OF REMOVAL**

Joseph J. Rego, Esq.
LAW OFFICES OF JOSEPH J. REGO
4019 Park Blvd.
San Diego, CA 92103

***Counsel for Plaintiff: ROY V. HURSH***
T: 619.293.0310
F: 619.293.0940
Jjrego2@msn.com

☐ By (ELECTRONIC MAIL) I caused the above document(s) to be transmitted to the office(s) of the addressee(s) listed above by electronic mail at the e-mail address(es) set forth above pursuant to Fed.R.Civ.P.5(d)(1). *"A* Notice of Electronic *Filing (NEF) is generated automatically by the ECF system upon completion of an electronic filing. The NEF, when e-mailed to the e-mail address of record in the case, shall constitute the proof of service as* required *by Fed.R.Civ.P.5(d)(1). A copy of the NEF shall be attached to any document served in the traditional manner upon any party appearing pro se."*

And/or

by placing a true copy thereof in a sealed envelope(s) addressed as stated above and causing such envelope(s) to be deposited in the U.S. Mail at Los Angeles, California.

☑ (MAIL) I am readily familiar with this firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

☐ (OVERNIGHT DELIVERY) by depositing in a box or other facility regularly maintained by Federal Express , an express service carrier, or delivering to a courier or driver authorized by said express service carrier to receive documents, a true copy of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed as stated above, with fees for overnight delivery paid or provided for and causing such envelope(s) to be delivered by said express service carrier.

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction the service was made and that the foregoing is true and correct.

Executed on **July 22, 2008**, at Los Angeles, California.

Simone Robinson
(Type or print name)

Simone Robinson
(Signature)



LIBW/1683469.1

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 153215 - MB**

**July 22, 2008**
**13:09:13**

**Civ Fil Non-Pris**
USAO #.: 08CV1313 CIVIL FILING
Judge..: NAPOLEON A JONES, JR
Amount.: $350.00 CK
Check#.: BC1042

**Total-> $350.00**

FROM: ROY V HURSH VS COUNTRYWIDE

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
ROY V. HURSH

**DEFENDANTS**
COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; FULL SPECTRUM LENDING, INC.; ANGELO MOZILO; and DAVID SAMBOL

FILED
08 JUL 22 PM 1:05
CLERK, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

**(b)** County of Residence of First Listed Plaintiff San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant Los Angeles
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Law Offices of Joseph J. Rego
Joseph J. Rego
4019 Park Blvd.
San Diego, CA 92103
(619) 293-0310

Attorneys (If Known)
See attachment

'08 CV 1313 J NLS

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

See 28 U.S.C. Section 1332(d)(2)(A), (C)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff (For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

See 28 U.S.C. Section 1332(d)(2)(A), (C)

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☒ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury— Med. Malpractice
- ☐ 365 Personal Injury — Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence

Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus – Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
28 U.S.C. § 1332(d)(2)(A), (C), 28 U.S.C. § 1441(b)

Brief description of cause:
Plaintiff alleges Defendants violated California Business & Professions Code Section 17500 by making or disseminating untrue or misleading statements to induce him and others to enter into mortgage loans. Plaintiff also alleges acts or practices that constituted unfair competition in violation of California Business and Professions Code 17200. Plaintiff seeks various forms of relief, including certification of the action as a class action; compensatory damages; punitive damages; restitution; and attorneys' fees.

**VII. REQUESTED IN COMPLAINT:**
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
**DEMAND** $5,000,000.00+
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE Hon. Stephen V. Wilson
DOCKET NUMBER CV 07-6094 SVW (AJWx); Cent. Dist. Calif.; White, et al. v. Countrywide Financial Corporation, et al.

American LegalNet, Inc. www.FormsWorkflow.com

IS 3215 $350.00 TB 07/22/08

DATE
July 22, 2008

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ________ AMOUNT ________ APPLYING IFP ________ JUDGE ________ MAG. JUDGE ________

American LegalNet, Inc.
www.Forms*Workflow*.com

Exhibit 1

<u>ATTORNEYS FOR DEFENDANTS:</u>
COUNTRYWIDE FINANCIAL CORPORATION,
COUNTRYWIDE HOME LOANS, INC., & FULL SPECTRUM LENDING

Brooks R. Brown (SBN 250724)
*bbrown@goodwinprocter.com*
**GOODWIN PROCTER LLP**
10250 Constellation Blvd, 21st Floor
Los Angeles, CA 90067
Telephone 310.788.5100
Facsimile: 310.286.0992

Thomas M. Hefferon (*pro hac vice to be filed*)
*thefferon@goodwinprocter.com*
**GOODWIN PROCTER LLP**
901 New York Avenue, NW
Washington, DC 20001
Telephone: 202.346.4000
Facsimile: 202.346.4444

Paul G. McNamara (SBN 106080)
*pmcnamara@omm.com*
**O'MELVENY & MYERS LLP**
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: 213.430.6000
Facsimile: 213.430.6407