O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
LOS ANGELES

1625 Eye Street, NW
Washington, D.C. 20006-4001

TELEPHONE (202) 383-5300
FACSIMILE (202) 383-5414
www.omm.com

NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO

FILED
JUL 31 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

OUR FILE NUMBER
019368-0110

WRITER'S DIRECT DIAL
(202) 383-5153

WRITER'S E-MAIL ADDRESS
[illegible]no@omm.com

July 28, 2008

**VIA HAND DELIVERY**

Jeffery N. Lüthi
Clerk of the Panel
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E.
Room G-255, North Lobby
Washington, D.C. 20002-8004

08CV1313-L(NLS)

Re: ***In re Countrywide Mortgage Litigation***

Dear Mr. Lüthi:

This is to advise the Panel that there is another action that Countrywide Financial Corp., Countrywide Bank, FSB, Countrywide Home Loans, Inc., and Bank of America Corporation ("Movants") believe should be included as part of any MDL proceeding that results from Movants' July 24, 2008 motion for transfer and pretrial coordination or consolidation under 28 U.S.C. § 1407 ("Motion").

The action, *People of the State of California v. Countrywide Financial Corp. et al.*, was filed on July 23, 2008 in the Superior Court of California, County of San Diego, by Michael J. Aguirre, in his official capacity as the City Attorney for the City of San Diego, against Countrywide Financial Corp., Bank of America Corporation, Angelo Mozilo, David Sambol, Stanford Kurland, and Carlos Garcia ("City of San Diego Action").

The City of San Diego Action complaint alleges that defendants violated the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, based on an alleged scheme to deceptively market complex, risky, and unsuitable mortgage loans in order to maximize Countrywide's share of the secondary mortgage market. The City of San Diego Action tracks, and expressly refers to, the allegations in the California Attorney General's action, which is one of the actions subject to the Motion. *People of the State of California v. Countrywide Financial Corp.*, 08-04861 SVW (JCx) (C.D. Cal., removed July 24, 2008, originally filed in Superior Court of California, Los Angeles County). (*See* City of San Diego Action Complaint ¶ 24 ("The factual allegations herein are based upon the following: . . . (c) allegations contained within the matter of the *People of the State of California v. Countrywide Financial Corporation*, Case No. LC081846, filed in the Superior Court of the State of California, County of Los Angeles.").)

The City of San Diego Action was removed on July 25, 2008 to the United States District Court for the Southern District of California. It is assigned to the Hon. Janis L. Sammartino and its case number is 08-CV-1348. This firm represents all defendants in the City of San Diego action. Four (4) copies of the complaint in the City of San Diego Action are enclosed.

In the event that the Panel determines that it is inappropriate to include the City of San Diego Action among the actions included in the Schedule of Actions that accompanied the Motion, we will, of course, identify the City of San Diego Action as a potential "tag-along" action at the appropriate time in accordance with Rules of Procedure of the Judicial Panel on Multidistrict Litigation.

Please do not hesitate to let me know if you have any questions. Thank you.

Respectfully submitted,

Christopher D. Catalano*
for O'MELVENY & MYERS LLP

*Admitted in California; supervised by principals of the firm.

CDC

Enclosures

cc: Clerk, Central District of California (via First Class Mail)
Clerk, Southern District of California (via First Class Mail)
Clerk, Northern District of Illinois (via First Class Mail)
Michael J. Aguirre (Plaintiff's counsel in City of San Diego Action) (via First Class Mail)
Edmund G. Brown Jr. (via First Class Mail)
Lisa Madigan (via First Class Mail)
Joe R. Whatley, Jr. (via First Class Mail)
Christopher Kim (via First Class Mail)
George T. Busu (via First Class Mail)
Joseph J. Rego (via First Class Mail)
Thomas M. Hefferon (via First Class Mail)
Brooks R. Brown (via First Class Mail)

MICHAEL J. AGUIRRE, City Attorney
California State Bar No. 60402
CHRISTOPHER S. MORRIS, Assistant City Attorney
MARGARET G. JACOBO, Assistant City Attorney
DIANE SILVA-MARTINEZ, Head Deputy City Attorney
DAVID J. KARLIN, Head Deputy City Attorney

Office of the City Attorney
Criminal Division
1200 Third Avenue, Suite 700
San Diego, California 92101
(619) 533-5500; Fax (619) 533-5505

Attorneys for Plaintiff

NO FEE GC § 6103

FILED
JUL 31 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY [signature] DEPUTY

08CV1313-L(NLS)

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN DIEGO**

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; BANK OF AMERICA, a Delaware corporation; ANGELO MOZILO, an individual; DAVID SAMBOL, an individual; STANFORD KURLAND, an individual; CARLOS GARCIA, an individual; DOES 1-200, and ROES 1-500, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR INJUNCTION, RESTITUTION, OTHER EQUITABLE RELIEF, AND CIVIL PENALTIES**<br><br>I/C Judge:<br>Dept.:<br>Action Filed:<br>Trial Date: Not Set |

Michael J. Aguirre, acting in his official capacity as City Attorney for the City of San Diego, brings this action in the name of the People of the State of California ("Plaintiff"). Plaintiff is informed and believes, and based on such information and belief, alleges the following:

## I. NATURE AND SUMMARY OF ACTION

1. Defendant Countrywide Financial Corporation and its agents, officers, employees, and affiliated or associated parties engaged in a pattern of unlawful, fraudulent or unfair

predatory real estate lending practices causing victims of such behavior, in the City of San Diego, to lose or be in jeopardy of losing their homes though foreclosure.

2. As demonstrated in Exhibit 1, attached hereto, foreclosures have occurred throughout San Diego County. Particularly hard hit are neighborhoods located in the southern and southeastern portions of the City of San Diego.

3. Defendants' unlawful, fraudulent or unfair "predatory" lending practices directed against San Diego home purchasers and homeowners involved one of the following elements:

a. Making loans based predominantly on the foreclosure or liquidation value of a borrower's collateral rather than on the borrower's ability to repay the mortgage according to its terms;

b. Inducing the borrower to repeatedly refinance a loan in order to charge high points and fees each time the loan is refinanced ("loan flipping"); or

c. Engaging in fraud or deception to conceal the true nature of the mortgage loan obligation.

4. The goal of Countrywide's unlawful, fraudulent, or unfair "predatory" lending practices was to increase the Company's share of the national mortgage market by mass producing loans for sale on the secondary market. In this scheme, borrowers were nothing more than the means for producing more loans. Countrywide originated loans with little or no regard for the borrowers' financial ability to afford the loans or to sustain homeownership.

5. Defendants were also motivated to engage in the unlawful, fraudulent or unfair business practices for personal, financial benefit. As a result of directing Countrywide to engage in unlawful, fraudulent, and unfair business practices as alleged in this Complaint, the Individual Defendants, named below, personally benefited in the total sum exceeding $800 million.

6. This action is brought to enjoin Countrywide from initiating or advancing any foreclosure on any residential mortgage involving properties which are owner occupied in the City of San Diego when the residential mortgage contains the following characteristics:

a. The loan is an adjustable rate mortgage ("ARM") with an introductory rate period of three years or less;

b. The loan has an introductory or "teaser" rate for the initial period that is at least 3 percent lower than the fully indexed rate;

c. The borrower has a debt-to-income ratio that would have exceeded 50 percent if the lender's underwriters had measured the debt, not by the debt due under the teaser rate, but by the debt due under the fully indexed rate; and

d. The loan-to-value ratio is 100 percent or the loan carries a substantial prepayment penalty or a prepayment penalty that extends beyond the introductory period.

## II. DEFENDANTS AND VENUE

7. Defendant Countrywide Financial Corporation ("Countrywide" or "CFC" or the "Company") is a corporation organized and existing under the laws of the State of Delaware that transacted business in the County of San Diego, State of California and elsewhere in the United States and internationally. CFC carried out the unlawful, fraudulent, or unfair predatory lending practices though several divisions and subsidiaries including, but not limited to, Countrywide Home Loans, Inc. ("CHL"), a New York corporation; Full Spectrum Lending, Inc. ("Full Spectrum"), either as a California corporation or as a division of CHL.

8. Defendant Bank of America Corporation ("BofA") is a corporation organized and existing under the laws of the State of Delaware. At all relevant times, BofA has transacted and continues to transact business in the City of San Diego. In January 2008, BofA announced that it had entered into an agreement to acquire Countrywide in an all-stock deal. It is believed that BofA's purchase of Countrywide was completed on July 1, 2008. BofA is named as a Defendant solely due to its purchase of Countrywide.

9. Defendant Angelo R. Mozilo ("Mozilo") was a CFC director and has been since 1969. Defendant Mozilo is a co-founder of Countrywide and has been Chairman of the Board of the CFC since March 1999 and Chief Executive Officer of the CFC since February 1998. Defendant Mozilo was also President of the CFC from March 2000 through December 2003, and served in other executive capacities since the Company's formation in March 1969. Defendant Mozilo directed, authorized, and ratified the conduct of CFC as set forth herein. During the relevant time period, Defendant Mozilo sold over 12.8 million shares of Countrywide stock for

proceeds in excess of $474 million. Defendant Mozilo resides in the County of Ventura, California.

10. Defendant David Sambol ("Sambol") is a CFC director and has been since September 2007. Defendant Sambol joined CFC in 1985. Defendant Sambol served as Executive Managing Director of Business Segment Operations, leading all revenue generating functions of the Company, as well as the corporate operational and support units comprised of Administration, Marketing and Corporate Communications and Enterprise Operations and Technology. Defendant Sambol is currently President and Chief Operating Officer ("COO") for CFC. Defendant Sambol also serves as Chairman and CEO of CHL, where he directed, authorized and ratified the conduct of CHL. Sambol admittedly "leads all operations of the Company" and has "oversight responsibility" for CHL, as well as CFC's bank, CFC's insurance group, CFC's Capital Markets Division and CFC's Global Operations Division. During the relevant time period, Defendant Sambol sold over 1.4 million shares of Countrywide stock for proceeds in excess of $54 million. Defendant Sambol resides in the County of Los Angeles, California.

11. Defendant Stanford L. Kurland ("Kurland") resigned from the position of President and Chief Operating Officer ("COO") of CFC in September 2006. Defendant Kurland began his career with CFC in 1979, and served in a number of executive positions, including President of CHL, Senior Managing Director of Finance, Chief Financial Officer ("CFO") and Vice President-Controller. During the relevant time period, Defendant Kurland sold over 5.1 million shares of Countrywide stock for proceeds in excess of $185 million. Defendant Kurland resides in the County of Los Angeles, California.

12. Defendant Carlos M. Garcia ("Garcia") joined the CFC in 1984 and oversaw all corporate operations, including the e–Business Division, Finance, Administration, Human Resources, and Information Technology. Defendant Garcia has served as Chief Financial Officer ("CFO") of CFC and as a member of the board of directors for CFC Capital Markets, Inc., and as CEO of CFC Insurance Group, Inc. Defendant Garcia is currently Chairman of CFC Bank, FSB. Defendant Garcia also serves as Executive Managing Director, Chief of Banking

and Insurance for CFC Financial Corporation and Chairman of Balboa Insurance Group, Inc. Defendant Garcia further serves as a member of the CFC Committee. During the relevant time period, Defendant Garcia sold over 1.2 million shares of Countrywide stock for proceeds in excess of $50 million. Defendant Garcia resides in the County of Los Angeles, California.

13. Defendants Mozilo, Sambol, Kurland and Garcia may also be referred to collectively as the "Individual Defendants."

14. The Individual Defendants, by reason of their positions as directors and/or officers and fiduciaries of Countrywide and because of their ability to control the business, corporate and financial affairs of the Company, were to ensure that Countrywide was managed and operated in compliance with all applicable federal and state laws, rules and regulations.

15. The true names of Defendants DOES 1 through 200, who joined in the unlawful, fraudulent, or unfair predatory lending practices as officers, agents, employees, associated parties, or affiliates of the above-named Defendants, are currently unknown to the People, who, therefore, sue such Defendants by their fictitious names. The People will seek leave to amend this Complaint to allege the true names of DOES 1 through 200 when the same have been ascertained. The People are informed and believe, and based on such information and belief, alleges that each of the fictitiously named Defendants participated in some or all of the acts alleged herein.

16. The true names of Defendants ROES 1 through 500, who otherwise assisted above-named Defendants who either engaged in the unlawful, fraudulent, or unfair predatory lending practices, or aided and abetted in the same by investing in the mortgage-backed securities, are currently unknown to the People, who, therefore, sue such Defendants by their fictitious names. ROES 1 through 500 may be discovered to be "securitizers" – investment banking firms from Wall Street and elsewhere that actually provided the cash used to make Countrywide's loans. The People will seek leave to amend this Complaint to allege the true names of ROES 1 through 500 when the same have been ascertained. The People are informed and believe, and based on such information and belief, alleges that each of the fictitiously named Defendants participated in some or all of the acts alleged herein.

17. At all relevant times, each of the Defendants acted as the principal, agent, or representative of each of the other Defendants, and in doing the acts herein alleged, each Defendant was acting within the course and scope of the agency relationship with each of the other Defendants, and with the permission and ratification of each of the other Defendants.

18. At all relevant times, Defendants have controlled, directed, formulated, known and/or approved of the various acts and practices of each of the Defendants.

19. Whenever reference is made in this Complaint to any act of any corporate or other business defendant, such allegation shall mean that the corporation or other business did the acts alleged through its officers, directors; employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

20. At all relevant times, each Defendant knew or realized that the other Defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Knowing or realizing that other Defendants were engaging in or planning to engage in unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts. Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

21. At all relevant times, Defendants have engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this Complaint. The conspiracy, common enterprise, and common course of conduct continue to the present.

22. Whenever reference is made in this Complaint to any act of Defendants, such allegations shall mean that each Defendant acted individually and jointly with the other Defendants named in that cause of action.

23. At all times mentioned in this Complaint, Defendants transacted business within and from the City of San Diego, State of California, and the violations of law described herein were committed within and from the City of San Diego, State of California.

///

///

## III. FACTUAL ALLEGATIONS

24. The factual allegations contained herein are based on the following: (a) an investigation conducted by the San Diego City Attorney's Office; (b) the review of public records in San Diego County; (c) allegations contained within the matter of the *People of the State of California v. Countrywide Financial Corporation*, Case No. LC081846, filed in the Superior Court of the State of California, County of Los Angeles; (d) allegations contained with the matter of *In re Countrywide Financial Corp. Derivate Litigation*, Case No. 07-CV-06923-MRP-(MANx), in the United States District Court for the Central District of California, that has be found sufficient to state a securities violations claim (*see In re Countrywide Financial Corp. Derivate Litigation*, 2008 WL 2064977 (C.D. Cal. May 14, 2008)); (e) allegations contained with the matter of *Commonwealth v. Fremont Inv. & Loan*, 2008 WL 517279 (Mass.Super. Feb. 26, 2008); and (f) allegations contained with the matter of *M & T Mortgage Corp. v. Foy*, 858 N.Y.S.2d 567 (2008). As such, the allegations contained herein are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

### A. Countrywide's Residential Mortgage Operations

25. Countrywide was one of the largest residential mortgage lenders in the United States, responsible for originating and/or servicing over 18% of residential mortgages nationally.

26. Countrywide managed its business through five divisions: (1) Mortgage Banking, which originated, purchased, sold and serviced non-commercial mortgage loans nationwide; (2) Banking, which was a federally registered banking institution that took deposits and invested in mortgage loans and home equity lines of credit ("HELOCs"), principally those issued by the Company's Mortgage Banking division but also through third party issued mortgages; (3) Capital Markets, which operated an institutional broker-dealer specializing in underwriting and trading mortgage-backed securities ("MBS"); (4) Insurance, which provided property, casualty, life, and disability insurance as well as reinsurance coverage to primary mortgage insurers; and (5) Global Operations, which licensed proprietary software to mortgage businesses abroad.

27. Countrywide typically originated residential loans in the Mortgage Banking division, kept a portion of those loans on its balance sheet as investments, primarily in the Banking Division, and securitized and sold off the remainder of the mortgages or mortgage related rights and obligations to third parties, through the Capital Markets division.

28. Countrywide originated residential mortgage loans and HELOCs through both wholesale and retail channels. In the wholesale channel, employees worked closely with a nationwide network of mortgage brokers to originate loans. In the retail channel, employees in Countrywide's Consumer Markets Division sold loans directly to consumers. Full Spectrum employees also sold loans directly to consumers as part of Countrywide's retail channel.

29. Over the years, the residential mortgage banking business evolved from one in which lenders originated mortgages for retention in their own portfolios to one in which lenders originate loans for resale to the secondary mortgage market.

30. During the relevant time period, many of the residential mortgages originated Countrywide were sold into the secondary mortgage market, primarily in the form of securities and to a lesser extent in the form of whole loan sales.

31. Although the mortgages which it originated were generally sold into the secondary mortgage market, Countrywide typically performed the ongoing servicing functions related to the residential mortgage loans that it produced.

32. Mortgages are "securitized" when loans are pooled together and transferred to a trust controlled by the securitizer, such as Countrywide. The trust then creates and sells securities backed by the loans in the pool. Holders of the securities received the right to a portion of the monthly payment stream from the pooled loans, although they were not typically entitled to the entire payment stream. Rather, the holders received some portion of the monthly payments. The securitizer, or the trust it controls, often retains an interest in any remaining payment streams not sold to security holders. These securitizations could involve the pooling of hundreds or thousands of loans, and the sale of many thousands of shares.

///

///

**B. Countrywide Shifts Its Strategy From Traditional Loans To Risky Non-Traditional Loans**

33. Through 2003, Countrywide primarily made traditional first lien home loans to highly creditworthy individuals. These "conforming" loans are safer from a credit perspective. Conforming loans are also easily sold to Fannie Mae and Freddie Mac, government-sponsored entities that provide liquidity to the market for home mortgages.

34. Beginning in 2003 and carrying into the relevant time period, Countrywide moved to originating more non-conforming loans. This exposed Countrywide to more risky loans, with higher default rates. Moreover, these loans could not be sold to government-sponsored entities (like Fannie Mae and Freddie Mac), but had to be sold to private institutional investors.

35. At the same time, Countrywide was also pursuing a dramatic shift in strategic direction away from traditional fixed-rate home loans to borrowers with "prime" credit scores, in favor of a wide range of non-traditional, high-risk home loans designed to allow borrowers from all credit levels to borrow more money for home purchases than would have been available under traditional fixed product lending guidelines.

36. Mortgage brokers and other employees were compensated based on the volume of loans originated and received higher payments when selling these non-traditional loan products than they would selling standard loans. Accordingly, Countrywide's employees targeted more and more borrowers who were stretching to afford the loans – many of whom had no realistic ability to repay the loans.

37. Examples of these "non-traditional" loan products include:

a. Adjustable rate mortgages ("ARMs"), which typically provide for a low "teaser" interest rate for a predetermined introductory time period, ranging between 2 to 10 years. The majority of ARMs sold to subprime borrowers were called "2/28 loans," meaning that the teaser rate lasts for only two years before "resetting" to higher rates, which are typically tied to specified benchmarks or other criteria, as dictated by the fine print in the loan documentation. As a result, borrowers' monthly obligations would often increase dramatically after the introductory period.

b. Interest-only mortgages, which allow the borrower to pay only the interest accruing on the loan on a monthly basis for a predetermined time period. Thus, the loan principal balance remains constant. At the end of the initial time period, borrowers have to pay interest plus principal, and the interest may adjust depending on whether the loan is a fixed rate or ARM.

c. Pay-Option ARMs, which give the borrower the "option" whether to pay down loan principal, to make the monthly interest payment, or to make a "minimum" payment that is less than the interest accruing that month. If a borrower makes only the "minimum" payment, the difference between that amount and the monthly interest payment is added to the remaining loan principal. Thus, while a standard mortgage loan amortizes as principal is paid down and an "interest only" mortgage is non-amortizing, Pay-Option ARMs are subject to negative amortization, *i.e.*, the principal balance increases when interest payments are "skipped."

d. Stated income loans, which are based on a borrower's representations about ability to pay, with little or no documentation from the borrower to substantiate those representations. In these loans, the lender typically agrees not to inquire behind the borrower's represented income, leading many to call these products "liar loans."

e. Home equity lines of credit ("HELOCs"), which are second loans secured only by the difference between the value of a home and the amount due on a first mortgage. Upon a default and foreclosure, the HELOC lender receives proceeds from the sale of the underlying home only after the first lien holder is paid in whole. HELOCs sit in the "first loss" position. Therefore, even a 10-20% reduction in home prices can have a dramatic effect on the collateral securing HELOCs – resulting in the entire amount of the HELOC becoming unsecured.

38. Beginning in 2003, Countrywide substantially increased its production of non-traditional, high-risk mortgages – both in absolute dollar amounts and as a percentage of the company's total mortgage origination. The table below sets forth the company's non-traditional mortgage originations – loans which are particularly sensitive to a drop in housing prices and/or an interest rate increase:

| | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| **Adjustable-Rate Loans as % of Total Loans Originated** | 14% | 21% | 52% | 52% | 45% |
| **HELOCS as % of Total Loans Originated** | 4.6% | 4.2% | 8.5% | 9.0% | 10.2% |
| **Non-Prime Loans as % of Total Loans Originated** | 3.7% | 4.6% | 10.9% | 8.9% | 8.7% |

39. The following chart illustrates how Countrywide's origination of HELOCs, non-prime mortgages, and ARMs grew in absolute numbers and as a percentage of the company's total mortgage origination before and during the relevant time period.

| Mortgage Loan Production<br>Years Ended December 31, | | | | | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 |
| | | | (in millions) | | |
| Total Mortgage Loans | **$251,901** | **$434,864** | **$363,364** | **$499,301** | **$468,172** |
| HELOC<br><br>(% of total) | **11,650**<br><br>**(4.6%)** | **18,103**<br><br>**(4.2%)** | **30,893**<br><br>**(8.5%)** | **44,850**<br><br>**(9.0%)** | **47,876**<br><br>**(10.2%)** |
| Nonprime Mortgage<br><br>(% of total) | **9,421**<br><br>**(3.7%)** | **19,827**<br><br>**(4.6%)** | **39,441**<br><br>**(10.9%)** | **44,637**<br><br>**(8.9%)** | **40,596**<br><br>**(8.7%)** |
| Pay-option ARMs as a % of total | **N/A** | **N/A** | **6%** | **19%** | **14%** |
| Adjustable-Rate Loans as a % of total | **14%** | **21%** | **52%** | **52%** | **45%** |

40. Countrywide increased its production of these loans by offering them to persons who could not or would not provide documentation of their income. In 2004, 78% of the Pay-Option ARMs originated by Countrywide were "low-doc" mortgages in which the borrower did not fully document income or assets. This number grew to 91% in 2006. According to the Company's Form 10-Q filed with the SEC on November 9, 2007, by the end of 2006, 81% of the

Pay-Option ARMs held for investment by the Countrywide were loans with low or no stated income documentation. Countrywide also increased its origination of Pay-Option ARMs by allowing borrowers to obtain Pay-Option ARMs without making substantial down payments.

41. At the time the Countrywide was growing the amount of risky loans it originated, it was increasing the amount of Pay-Option ARMs held by the Company for investment. Pay-Option ARM loans represented 46% of the mortgage loans held for investment on December 31, 2006. As set forth below, the amount of Pay-Option ARMs held by Countrywide for investment grew significantly during the Relevant Period (in $ millions):

| | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| **PAY-OPTION ARMS HELD FOR INVESTMENT** | N/A | 4,698 | 26,101 | 32,732 |

### C. Countrywide Deviates Significantly From Its Underwriting Standards In Order To Capture Greater Market Share

42. As Countrywide shifted to selling riskier, non-traditional loan products, it also transitioned into predatory lending practices. A substantial and material percentage of the residential loans originated by Countrywide during the relevant period involved significant variations from the Company's underwriting standards.

43. The active monitoring and control over Countrywide's underwriting and credit risk assessment processes was particularly important with respect to the Company's strategic shift favoring the origination of high-risk, non-traditional loans such as Pay-Option ARMs. In theory, if borrowers are good credit risks and reasonably sophisticated, they can make their mortgage payment options as needed to manage their cash flow needs over time. However, the risk becomes very significant if Countrywide sold Pay-Option ARMs: (1) to riskier borrowers (including those who would struggle even to make the minimum monthly interest payment); (2) at greater than expected loan to value ("LTV")(*i.e.*, the ratio of the loan amount to the appraised home value); and/or (3) based on limited if any documentation of income and repayment ability.

Yet, Countrywide failed to adopt strong internal controls necessary to adequately manage the risks associated with these products.

44. In carrying out its lending practices, Countrywide and its affiliated and associated parties failed to comply with prudent lending standards as follows:

a. Loan decisions were not based upon all relevant factors including the capacity of the borrower to adequately service the debt. For example, borrowers were entering into Pay-Option ARMs were very likely to experience "payment shock" when the loans reset. Under these circumstances, prudent qualifying standards would recognize the potential effect of payment shock in evaluating a borrower's ability to service debt;

b. A borrower's repayment capacity was not evaluated in terms of the borrower's ability to repay the debt by its final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule;

c. Borrowers were not qualified based upon the quantification of the borrower's repayment capacity by a debt-to-income (DTI) ratio, which should have included an assessment of a borrower's total monthly housing-related payments (*e.g.*, principal, interest, taxes, and insurance, or what is commonly known as PITI) as a percentage of gross monthly income. This was not done even when there was additional risk-layering such as reduced documentation, or simultaneous second lien mortgages.

45. Even when these risk-layering features were present, there was an absence of mitigation factors to support Countrywide's underwriting decisions. Thus, the borrowers' repayment capacity was not verified, the borrowers' income (source and amount) was not checked, and the borrower's assets and liabilities were not confirmed.

46. Countrywide also regularly approved "stated income" or no-documentation loans even though the same applicant had been refused a loan under the Company's full-documentation loan program. In such instances, the Company's loan officers would "assist" the applicant in switching to a no-document loan.

47. Countrywide operated a computer system that routed highly risky loans out of the normal loan approval process and to a central underwriting group for evaluation. The system

was called the Exception Processing System. The Exception Processing System identified loans that violated the Company's underwriting requirements. For example, the system flagged loans in which the loan-to-value ratio was too high when compared with the borrower's FICO score. Flagged loan applications were then routed to the company's "Central Underwriting" group located in Plano, Texas (headquarters of the Retail Lending group).

48. There, loan applications identified by the Exception Processing System as violating the Company's underwriting standards were not rejected. Rather, the applications were evaluated on whether Countrywide should require a higher price (i.e., "up front points") or a higher interest rate in light of the violation at issue.

49. Furthermore, the Individual Defendants knew Countrywide was extending loans that did not comply with the Company's underwriting policies and procedures. Countrywide's approval of loans that it knew to be high risk and likely to end up in default demonstrated an utter disregard for the well-being of the borrower.

50. These practices also clearly demonstrated that almost anyone could get a loan, even if they had very little to no chance of paying it back.

51. Countrywide's strategic shift towards the relaxation of its underwriting and origination procedures was brought about to facilitate an increase in the Company's market share of the residential mortgage business. The Company pushed one goal above all others – originating loans and selling them to the secondary markets as fast as possible.

**D. Countrywide Engages in Deceptive, Predatory <u>Practices To The Detriment Of Borrowers</u>**

52. Countrywide also utilized deceptive lending practices to extend credit to individuals who did not understand the terms and dangers of the costly loans they could not afford. Countrywide's agents, associated parties, and affiliates used predatory lending practices in which borrowers were convinced to agree to unfair and abusive loan terms including interest rates and/or fees that were unreasonably high.

53. Countrywide's deceptive lending practices included (a) advertising that the Company, as the nation's largest lender, could be trusted by consumers; (b) encouraging

borrowers to refinance or obtain purchase money financing with complicated mortgage instruments like hybrid ARMs or Pay-Option ARMs that consumers did not understand; (c) marketing these complex loan products by emphasizing the very low initial "teaser" or "fixed" rates; (d) representing to borrowers that they could refinance prior to scheduled rate increases without disclosing the dangers of negative amortization or pre-payment penalties; and (e) routinely soliciting borrowers to refinance.

54. Defendants knew, or should have known, that Countrywide was required to operate within specific statutory and regulatory parameters limiting the interest rate and other fees that could lawfully be charged to borrowers as well as the types of selling practices that the Company could utilize.

55. Defendants knew that predatory lending practices were a significant problem in the industry, requiring they monitor the Company's lending practices closely.

56. Instead of closely monitoring the Company's lending practices, Defendants created and adopted an incentive compensation system that induced brokers and sales representatives to engage in predatory practices. For example, borrowers were routinely moved into the subprime category even if their financial position dictated that they belonged higher up on the loan spectrum. This occurred because the Company's brokers and sales representatives earned a greater commission by placing a borrower in a sub-prime loan. Brokers received commissions of 0.50% of the loan's value versus 0.20% on loans one step up the quality ladder, known as Alternate-A loans.

57. Countrywide's sale of ARMs provides another example of predatory lending practices exhibited by the Company. As described, these types of mortgages offered low initial payments based on a fixed introductory or "teaser" rate that expires after a short period, and then adjusts to a variable rate plus a margin for the remaining term of the loan. When the rate resets, borrowers experience "payment shock" and are unable to afford the higher payments. These types of loans were typically offered to subprime borrowers and issued with limited or no document basis. Additionally, ARMs typically carry substantial pre-payment penalties. Yet, the

borrowers of these loans are likely to have to resort to frequently refinancing in order to maintain an affordable monthly payment.

58. Countrywide deceptively marketed Pay-Option ARMs by aggressively promoting the teaser rate. Advertisement did not effectively distinguish between the "payment rate" and the interest rate on the loans, and any warnings about potential negative amortization.

59. Borrowers, enticed by the low teaser rate, did not fully understand the fine print in the loan documents or the financial implications of Countrywide's Pay-Option ARMs.

60. It is clear that borrowers did not understand the risks and consequences of obtaining this type of ARM loan. Borrowers who obtained these loans faced unaffordable monthly payments after the initial rate adjustment, difficulty in paying real estate taxes and insurance that were not escrowed, or expensive refinancing fees, any of which could cause borrowers to default and potentially lose their homes.

61. These consumers were not protected from unfair, deceptive, and other predatory lending practices. Countrywide failed to provide clear and balanced information about the risks and features of these loans to the detriment of its borrowers.

62. Compounding the predatory nature of Countrywide's lending practices, Countrywide aggressively marketed refinance loans to, among others, Countrywide's customers. Countrywide created a perpetual market for its refinance loans by selling Pay-Option and hybrid ARMs that borrowers would have to refinance in order to avoid payment shock. Countrywide knew that borrowers who could not afford the inevitable payment increase on such loans and who were unable to refinance would be at great risk of losing their homes.

63. Refinancing also served as a means to overcome a borrower's apprehension about purchasing a Pay-Option or hybrid ARM. Countrywide often overcame a borrower's concerns by promising the borrower that they would be able to refinance into a loan with more favorable terms before the rate reset and the monthly payments increased.

64. Countrywide failed to inform borrowers with interest-only or negative amortizing loans that refinancing was highly unlikely unless the value of their home increased. Further, Countrywide did not adequately inform borrowers about pre-payment penalties that would

essentially prevent many borrowers from refinancing prior to rates resetting and the accompanying payment explosion.

65. As a direct consequence of Countrywide's unfair, unlawful and fraudulent practices, borrowers were unable to afford the monthly payments after the initial rate adjustment due to payment shock. These borrowers also experienced difficulty in paying real estate taxes and insurance that were not escrowed. They incurred expensive refinancing fees, frequently due to closing costs and prepayment penalties. Ultimately, most borrowers ended up losing their homes.

66. Countrywide, on the other hand, continued its deceptive marketing practices for it cared only about doing whatever it took to increase the numbers of loans.

**FIRST CAUSE OF ACTION**

VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTION 17200

(UNFAIR COMPETITION)

67. Plaintiff realleges paragraphs 1 through 66 of the Complaint and incorporates same by this reference as though fully set forth herein.

68. Beginning on an exact date unknown to Plaintiff, but within four years prior to the filing of this Complaint, and continuing to the present, Defendants engaged in unfair competition in violation of Business and Professions Code 17200, including, but not limited to, one or more unlawful, unfair or fraudulent business acts or practices:

a. By significantly deviating from traditional underwriting standards when originating non-traditional loan products such as Pay-Option ARMs and hybrid ARMs;

b. By ignoring internal controls that suggested certain loan applications be denied and funding those loan applications merely to increase market share;

c. By creating an incentive based compensation system that induced brokers and sales associates to engage in predatory practices; and

d. By utilizing deceptive lending practices including, but not limited to, (i) aggressively promoting introductory or teaser rates; (ii) by failing to provide clear and balanced information concerning the risks and features of its non-traditional loans; and (iii) by creating a

perpetual refinancing market for itself when placing borrowers in loans they had no ability to repay.

**PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendants, DOES 1 through 200, and ROES 1 through 500, and each of them, on all causes of action as follows:

1. For judgment in favor of Plaintiff and against Defendants;

2. For a permanent injunction enjoining Defendants, their successors, assigns, agents, representatives, employees and all persons who act in concert with them from initiating or advancing any foreclosure on any residential mortgage involving properties which are owner occupied and where the following four factors exist:

a. The loan is an ARM with an introductory period of three years or less;

b. The loan has an introductory or "teaser" rate for the initial period that is at least 3 percent lower than the fully indexed rate;

c. The borrower has a debt-to-income ratio that would have exceeded 50% if the lender's underwriters had measured the debt, not by the debt due under the teaser rate, but by the debt due under the fully indexed rate; and

d. The loan-to-value ratio is 100% <u>or</u> the loan carries a substantial prepayment penalty <u>or</u> a prepayment penalty that extends beyond the introductory period.

3. For an order that Defendants can only reinitiate foreclosure proceedings on the above properties after showing proof to the City of San Diego that Defendants have met with the borrower and taken reasonable steps in an attempt to resolve their differences and avoid foreclosure.

4. For a permanent injunction enjoining Defendants, their successors, assigns, agents, representatives, employees and all persons who act in concert with them from engaging in unfair competition as defined in Business and Professions Code section 17200, including, but not limited to, the acts or practices alleged in this Complaint.

5. For the imposition of a civil penalty of $2,500 pursuant to Business and Professions Code section 17536 against each Defendant for each violation of Business and

Professions Code section 17500 as alleged in this Complaint. Plaintiff requests that civil penalty of no less than $100,000 be imposed against each Defendant.

6. For costs of suit incurred herein; and

7. For such further and other relief as the Court deems just and proper.

Dated:__________________

______________________________
MICHAEL J. AGUIRRE, City Attorney
Attorney for Plaintiff

FILED
JUL 31 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY KAJ DEPUTY

**BEFORE THE JUDICIAL PANEL**
**ON MULTIDISTRICT LITIGATION**

08CV1313-L(NLS)

IN RE COUNTRYWIDE MORTGAGE LITIGATION

MDL- ______

CERTIFICATE OF SERVICE

I hereby certify that a copy of a letter of today's date to the Clerk of the Panel, a copy of the complaint in *People of the State of California v. Countrywide Financial Corp.* (S.D. Cal., removed July 25, 2008, originally filed in Superior Court of California, County of San Diego), and a copy of this Certificate were served by First Class Mail on July 28, 2008, to the following (except O'Melveny & Myers LLP):

Clerk, Central District of California
Western Division
312 N. Spring Street
Los Angeles, California 90012

Clerk, Central District of California
Western Division
411 West Fourth Street, Room 1053
Santa Ana, California 92701-4516

Clerk, Southern District of California
880 Front Street, Suite 4290
San Diego, California 92101-8900

Clerk, Northern District of Illinois
Everett McKinley Dirksen
United States Courthouse

219 South Dearborn Street
Chicago, Illinois 60604

Joe R. Whatley, Jr.
Lili R. Sabo
Whatley Drake and Kallas LLC
1540 Broadway 37th Floor
New York, NY 10036
212-447-7070
Fax: 212-447-7077
Email: jwhatley@wdklaw.com
Email: lsabo@wdklaw.com

Counsel for plaintiffs Francis G. Sizemore; Rebecca G. Sizemore; Edward Marini; Kimberly Menichetti; Philip D. Menichetti; Sequesta L. Washington; C.D. California, 2:07-cv-06094

Christopher Kim
George T. Busu
Lim Ruger and Kim LLP
1055 West Seventh Street Suite 2800
Los Angeles, CA 90017
213-955-9500
Fax: 213-955-9511
Email: christopher.kim@lrklawyers.com
Email: george.busu@lrklawyers.com

Counsel for plaintiffs Symone Leyvas; John Leyvas; June Harding Brown; C.D. California, 8:08-cv-787

Edmund G. Brown Jr.
Attorney General of the State of California

Albert Norman Shelden
Senior Assistant Attorney General

Ronald Reiter
Supervising Deputy Attorney General

Kathrin Sears
Robyn Smith
Benjamin G. Diehl
Linda Hoos

Deputy Attorneys General

300 S. Spring Street, Suite 1702
Los Angeles, California 90013
213-897-5548
Fax: 213-897-4951

Counsel for plaintiffs the People of the State of California; C.D. California, 08-04861

Joseph J. Rego
4019 Park Boulevard
San Diego, California 92103
619-293-0310
Fax: 619-293-0940
Email: jjrego2@msn.com

Counsel for plaintiff Roy V. Hursh; S.D. California, 3:08-cv-01313

Lisa Madigan
Attorney General of Illinois

Deborah Hagan
Chief, Consumer Protection Division

James D. Kole
Chief, Consumer Fraud Bureau

Thomas James
Susan N. Ellis
Veronica L. Spicer
Shantanu Singh
Jennifer Franklin
Michelle Garcia
Cecilia Abundis
Assistant Attorneys General

100 W. Randolph St., 12th Floor
Chicago, Illinois 60601
312-814-3000

Counsel for plaintiffs the People of the State of Illinois; N.D. Illinois, 08-cv-4210

Thomas M Hefferon
Goodwin Procter LLP
901 New York Avenue NW
Washington, DC 20001
202-346-4000
Email: thefferon@goodwinprocter.com

Counsel for all defendants; C.D. California, 2:07-cv-06094; S.D. California, 3:08-cv-01313

Brooks R. Brown
Goodwin Procter LLP
10250 Constellation Boulevard
21st Floor
Los Angeles, CA 90067
310-788-5100
Fax: 310-286-0992
Email: bbrown@goodwinprocter.com

Counsel for all defendants; C.D. California, 2:07-cv-06094; S.D. California, 3:08-cv-01313

Michael J. Aguirre
City Attorney
Office of the City Attorney
1200 Third Avenue, Suite 700
San Diego, CA 92101
619-533-5500

Counsel for plaintiff; S.D. California, 08-CV-1348.

John Beisner
Brian D. Boyle
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
202-383-5300
Fax: 202-383-5414
jbeisner@omm.com
bboyle@omm.com

Counsel for defendant Full Spectrum Lending, Inc.; C.D. California, 08-04861, C.D. California, 8:08-cv-787, N.D. Illinois, 08-cv-4210

Counsel for defendant Angelo Mozilo; C.D. California, 08-04861, N.D. Illinois, 08-cv-4210

Counsel for defendant David Sambol; C.D. California, 08-04861

Counsel for defendant Countrywide Home Loans Servicing LP; N.D. Illinois, 08-cv-4210

Brian D. Boyle